38 F.3d 1559
 Robert Allen JORDAN, Plaintiff-Appellee,
v.
John DOE, Chief U.S. Marshal, Defendants,
David Adkins, Lydia Blakey, Joseph Enders, John Hardman,
Augustus Lawson and Ivar Swanson, Defendants-Appellants.
Robert Allen JORDAN, Plaintiff-Appellee,
v.
John DOE, U.S. Marshal, Deputy U.S. Marshal, United States
of America, et al., Defendants,
David Adkins, Lydia Blakey, Joseph Enders, John Hardman,
Ivar Swanson, Augustus Lawson, Defendants-Appellants.
 Nos. 91-3042, 92-2009.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 2, 1994.
 
 Warren A. Zimmerman, Asst. U.S. Atty., Tampa, FL, Freddi Lipstein, Jonathan R. Siegel, Appellate Staff, Civil Div., Dept. of Justice, Washington, DC, for appellants in No. 91-3042.
 Arthur Addess, Lake Worth, FL, for appellee.
 Robert Genzman, U.S. Atty., Tampa, FL, Warren A. Zimmerman, Asst. U.S. Atty., Freddi Lipstein, Jonathan Siegel, Appellate Staff, Civil Div., Dept. of Justice, Washington, DC, for appellants in No. 92-2009.
 Appeals from the United States District Court for the Middle District of Florida.
 Before COX and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.
 COX, Circuit Judge:
 
 I. Facts and Procedural History
 
 1
 Robert Allen Jordan filed this Bivens[1] action against officials of the United States Marshals Service. Jordan was arrested on a charge of bank robbery in 1986 and held without bail pending trial. While in federal custody, Jordan was transported and held in various local county jails in the Middle District of Florida. The Marshals Service had contracted with these local jails to house federal pretrial detainees on a temporary basis.
 
 
 2
 On cross motions for summary judgment, the district court construed Jordan's complaint as follows: count one alleged that the defendants placed Jordan in local "contract" jails where they knew unconstitutional conditions existed; count two alleged that the defendants released Jordan to state custody without a writ and in violation of an agreement governing federal detainees; and count three alleged that Jordan was denied adequate medical care while in local jails. The district court granted summary judgment in favor of the Marshals Service officials in their official capacities on all counts, based on sovereign immunity. The court also granted summary judgment in favor of the Marshals Service officials in their individual capacities on counts two and three.
 
 
 3
 On count one, the court granted summary judgment in favor of several Marshals Service officials because it found that Jordan had failed to present significantly probative evidence of unconstitutional conditions at the local jails to which these officials had transported Jordan. The court denied summary judgment on count one to Defendants-Appellants David Adkins, Lydia Blakey, Joseph Enders, John Hardman, Ivar Swanson, and Augustus Lawson ("the marshals") because it found that Jordan had raised an issue of material fact as to whether unconstitutional conditions existed at the Hillsborough County and Gilchrist County jails and whether the marshals were aware of those conditions. Deputy Marshals Adkins, Blakey, Hardman, Swanson, and Lawson ("the transporting marshals") had transported Jordan to the Hillsborough and Gilchrist jails. Enders, Assistant Director of the U.S. Marshals Service, had signed the contracts with county officials to house federal pretrial detainees.
 
 
 4
 With respect to the Hillsborough County jail, Jordan alleges that "he was forced to sleep on the floor due to overcrowding, that vermin, roaches and mice were rampant, the plumbing was faulty, and that conditions were filthy." R.2-79 at 10-11. Jordan also alleges that "Gilchrist County jail did not allow him to use the phone, was filthy, and did not have a law library." Id. at 11. Jordan submitted four inspection reports documenting ongoing problems at the Hillsborough County jail, including severe overcrowding and other problems with food, sanitation and housing that stemmed from overcrowded conditions. R.1-38 at exs. 3-6. Another report indicated that the Gilchrist County facility "continue[d] to be very clean, orderly and well maintained," R.1-38 at ex. 8, but Jordan submitted an affidavit by a prisoner, Joe Kotvas, contradicting the report and indicating problems with sanitation in his cell and the serving of cold food at the jail. R.1-59 at ex. 2. Kotvas further "stated that he had complained to the U.S. Marshals about problems such as overcrowding and the bad plumbing in his cell." Id. An affidavit by prisoner James David Strickland stated that "[t]he U.S. Marshals were told numerous times of the violations of the jails, but failed to respond." R.1-38 at ex. 12.
 
 
 5
 The district court denied the marshals' motions for summary judgment based on qualified immunity because: (1) the marshals had not established that they were acting within their discretionary authority; (2) the marshals did not explain what law and facts were known to the individual marshals; (3) the marshals might prevail on the merits so that the question of qualified immunity would not be reached; and (4) the marshals might not be entitled to qualified immunity if conditions at the Hillsborough and Gilchrist jails were unconstitutional and the marshals knew of such conditions. R.2-79 at 16-17. However, the court indicated that its denial was not permanent because it stated that it could not "at this juncture address whether Defendants are entitled to qualified immunity," R.2-79 at 17, and that it "await[ed] a properly argued and supported motion for summary judgment...." Id. at 15 n. 12.
 
 
 6
 These statements and other aspects of the district court's order led the defendants to believe that the court was not referring to their latest motion for summary judgment. Thus, the defendants filed a motion to reconsider along with more affidavits. After reassignment to another judge, the district court denied the motion to reconsider and stated that the December 1990 order constituted a ruling on the defendants' more recent motion for summary judgment. The marshals now appeal the district court's denial of their motions for summary judgment based on qualified immunity and the district court's denial of their motion to reconsider.
 
 II. Jurisdiction and Standards of Review
 
 7
 Our jurisdiction over this interlocutory appeal is governed by Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In Mitchell, the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. Sec. 1291 notwithstanding the absence of a final judgment." Id. at 530, 105 S.Ct. at 2817. Assuming we have jurisdiction, the issue of a government official's qualified immunity from suit presents a question of law, and "like the generality of such questions, must be resolved de novo on appeal." Elder v. Holloway, --- U.S. ----, ----, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994).
 
 III. Discussion
 A. Jurisdiction
 
 8
 Jordan asserts that the district court's order is not appealable because "the district court merely deferred a final decision in order for the defendants to submit additional proof as to their assertions of qualified immunity as a defense." Appellee's Br. at 12. Jordan relies on Riley v. Wainwright, 810 F.2d 1006 (11th Cir.1986), where we held that a district court's denial of the defense of qualified immunity did not turn on an issue of law, and thus was not subject to interlocutory appeal, because the case "required substantial factual development." Id. at 1007.
 
 
 9
 The marshals respond to this assertion by noting that the district court "ordered that the case proceed to trial" and they had "to move the district court to stay the trial pending appeal." Appellants' Reply Br. at 3. Thus, the marshals contend that the district court's order was final and appealable under Mitchell.
 
 
 10
 We agree that the district court's order was an appealable "final decision" under Mitchell. The Supreme Court has repeatedly stressed that qualified immunity is not simply a defense to liability, but an immunity from suit which "is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815; see Hunter v. Bryant, 502 U.S. 224, ----, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). Our decision in Riley is distinguishable from the present case because in this case Jordan's complaint, together with the affidavits and other documents he submitted,[2] sufficiently identified the facts underlying Jordan's claim to enable the district court to resolve the qualified immunity issue.[3]
 
 
 11
 Because the district court later denied the defendants' motion to reconsider, and scheduled the case for trial, we find no merit in Jordan's contention that the district court merely "postponed" deciding the issue of qualified immunity. We conclude that this court has jurisdiction pursuant to Mitchell to review the district court's denial of summary judgment based on qualified immunity.
 
 B. Qualified Immunity
 
 12
 "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Thus, before we scrutinize the marshals' assertion of qualified immunity, we first examine Jordan's contentions to determine whether he asserts a cognizable constitutional claim.
 
 
 13
 1. The Constitution and Conditions of Confinement
 
 
 14
 We begin with the proposition that, while the Constitution does not require prisons to be comfortable, it also does not permit them to be inhumane, "and it is now settled that 'the ... conditions under which [a prisoner] is confined are subject to scrutiny under the Eighth Amendment.' " Farmer v. Brennan, --- U.S. ----, ----, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting Helling v. McKinney, --- U.S. ----, ----, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993)). A valid Eighth Amendment claim of this kind has two components: (1) an objective component which requires that conditions be "sufficiently serious," Farmer, --- U.S. at ----, 114 S.Ct. at 1977; Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991); and (2) a subjective component which requires that prison officials exhibit "deliberate indifference" to prisoner health or safety. Farmer, --- U.S. at ----, 114 S.Ct. at 1977; Wilson, 501 U.S. at 301-05, 111 S.Ct. at 2326-27; see also Helling, --- U.S. at ----, 113 S.Ct. at 2480; Hudson v. McMillian, --- U.S. at ----, ----, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976).
 
 
 15
 "No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). "The objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.' " Hudson, --- U.S. at ----, 112 S.Ct. at 1000 (quoting Estelle, 429 U.S. at 103, 97 S.Ct. at 290). Only a deprivation which denies "the minimal civilized measure of life's necessities," Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399, is grave enough to violate the Eighth Amendment. Wilson, 501 U.S. at 298-99, 111 S.Ct. at 2324. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. at 305, 111 S.Ct. at 2327.
 
 
 16
 While the conditions under which a prisoner is held are subject to scrutiny under the Eighth Amendment, the conditions under which a pretrial detainee is confined are scrutinized under the Due Process Clauses of the Fifth and Fourteenth Amendments. Bell v. Wolfish, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 1872 & n. 16, 60 L.Ed.2d 447 (1979) (utilizing Fifth Amendment Due Process Clause); Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir.1985) (utilizing Fourteenth Amendment Due Process Clause), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). In Hamm, this Court held "that in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." 774 F.2d at 1574.
 
 
 17
 Thus, to determine the constitutionality of the conditions at the Hillsborough and Gilchrist County jails, one must look to "contemporary standards of decency," Estelle, 429 U.S. at 103, 97 S.Ct. at 290, to ascertain whether those conditions deprived Jordan of "the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399. More specifically, in order to violate due process, the conditions of which Jordan complains must, at a minimum, have deprived him "of a single human need." Wilson, 501 U.S. at 305, 111 S.Ct. at 2327.
 
 
 18
 Jordan contends that he was held in overcrowded, unsanitary local jails where the food was contaminated and fire hazards existed. These contentions implicate the deprivation "of a single human need," and if sufficiently severe, could constitute a deprivation of "the minimal civilized measure of life's necessities." Id. at 304-05, 111 S.Ct. at 2327. Thus we conclude that, at least by Fed.R.Civ.P. 12(b)(6) standards, Jordan has stated a claim under the Due Process Clause of the Fifth Amendment.
 
 2. Harlow v. Fitzgerald and its Progeny
 
 19
 The Supreme Court established the test for qualified immunity in Harlow v. Fitzgerald: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This formulation of the qualified immunity inquiry is intended to protect government officials "from undue interference with their duties and from potentially disabling threats of liability." Id. at 806, 102 S.Ct. at 2732. Thus, the protection of qualified immunity extends to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).
 
 
 20
 The district court based its denial of summary judgment partly on the fact that the defendants might later prevail on the merits. R.2-79 at 16-17. However, because civil suits against government officials can entail significant social costs, see Harlow, 457 U.S. at 814, 102 S.Ct. at 2736, the Supreme Court has, as we noted above, emphasized that qualified immunity "is an immunity from suit rather than a mere defense to liability; and ... it is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815 (emphasis in original). The Supreme Court has also "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter, 502 U.S. at ----, 112 S.Ct. at 536. Thus, the denial of summary judgment is not appropriate simply because the defendants might later win at trial.
 
 
 21
 In Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983), this circuit established a two-step analysis for applying the Harlow qualified immunity test. First, "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " Sammons v. Taylor, 967 F.2d 1533, 1539 (11th Cir.1992) (quoting Zeigler, 716 F.2d at 849). "[T]hen the burden shifts to the plaintiff to demonstrate that the defendant 'violated clearly established constitutional law.' " Id. (quoting Zeigler, 716 F.2d at 849).
 
 3. The Scope of Discretionary Authority
 
 22
 The district court held that the marshals had not established that they were acting within their discretionary authority. The court based that conclusion on the fact that the transporting marshals had not addressed "whether the act of transporting [Jordan] was discretionary or not." R.2-79 at 16 n. 14. The marshals argue that the district court misinterpreted qualified immunity to protect only discretionary actions and not ministerial acts such as transporting Jordan. From the language quoted above, it does appear that the district court believed an act must be discretionary to receive the protection of qualified immunity. This is an overly narrow interpretation of the term "discretionary authority."
 
 
 23
 In Rich v. Dollar, 841 F.2d 1558 (11th Cir.1988), we acknowledged that Zeigler provided no guidance for determining whether a government official's conduct fell " 'within the scope of his discretionary authority.' " Id. at 1564. Relying on pre-Harlow cases from this circuit, however, we then defined "discretionary authority" in this manner:
 
 
 24
 [A] government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'
 
 
 25
 Id. (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir.1981)). We thus interpreted the term "discretionary authority" to include all actions of a governmental official that (1) "were undertaken pursuant to the performance of his duties," and (2) were "within the scope of his authority." Rich, 841 F.2d at 1564.
 
 
 26
 Jordan does not dispute the fact that all of the marshals were acting pursuant to their job functions and within the scope of their authority. The transporting marshals' actions in delivering Jordan from one facility to another clearly fall within the Rich definition of "discretionary authority" whether such actions be characterized as ministerial or discretionary in nature. Moreover, "it would be unwise to engage in a case by case determination of Section 1983 immunity based upon the ministerial versus discretionary nature of the particular official act challenged." Coleman v. Frantz, 754 F.2d 719, 727 (7th Cir.1985); see also McIntosh v. Weinberger, 810 F.2d 1411, 1432 (8th Cir.1987) (finding "no recent case ... in which a court has rejected qualified immunity simply because the official in question was performing a ministerial duty"), vacated and remanded on other grounds sub nom. Turner v. McIntosh, 487 U.S. 1212, 108 S.Ct. 2861, 101 L.Ed.2d 898, cert. denied, 487 U.S. 1217, 108 S.Ct. 2870, 101 L.Ed.2d 905 (1988). Enders's actions in signing the contracts with county officials also fall within that definition. The district court erred in concluding that the marshals were not entitled to qualified immunity because they had not established that they were acting within the scope of their discretionary authority.
 
 
 27
 4. Violation of "Clearly Established Law"
 
 
 28
 Because all of the marshals service officials were acting within the scope of their discretionary authority, the burden under Zeigler shifted to Jordan to show that the Marshals " 'violated clearly established constitutional law' " under Harlow. Sammons, 967 F.2d at 1539 (quoting Zeigler, 716 F.2d at 849). To be clearly established, the "contours" of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). This does not mean that a court must have previously found the very action in question unlawful, but it does mean that "in the light of pre-existing law the unlawfulness must be apparent." Id.
 
 
 29
 By adapting language from Anderson to fit the law applicable to cases involving pretrial detention conditions, we can distill the qualified immunity issue in this case to one objective, albeit fact-specific (and lengthy) question: In light of the clearly established law at that time, would a reasonable government official, having the information the marshals had about the local jails, have understood that contracting to place Jordan in the local jails or transporting Jordan to the local jails would violate Jordan's constitutional rights because the conditions in those jails would deprive Jordan of at least one human need? We conclude that the answer to this question is "no," and thus the marshals are entitled to qualified immunity in this case.
 
 
 30
 In Hamm v. DeKalb County, 774 F.2d at 1567, the plaintiff sued DeKalb County, Georgia, alleging that he was subjected to unconstitutional conditions in the DeKalb County jail during his incarceration there. During his incarceration, "the jail's population at times exceeded the facility's design capacity. As a result of the overpopulation, at times Hamm slept on an eating table or on a mattress placed on the floor. Often the floor and the linens provided were unsanitary." Id. at 1569. Hamm also alleged that the food in the jail occasionally contained foreign objects, and that he was denied adequate medical care. Id. at 1569-70.
 
 
 31
 While the conditions in the DeKalb County jail were doubtless unpleasant, we held that they were not unconstitutional. "The fact that the food occasionally contains foreign objects or sometimes is served cold ... does not amount to a constitutional deprivation.... The fact that Hamm temporarily had to sleep upon a mattress on the floor or on a table is not necessarily a constitutional violation." Id. at 1575. Even when considered in conjunction with Hamm's medical care claims, the "totality of conditions" was not unconstitutional. Id. at 1575-76.
 
 
 32
 In light of our decision in Hamm, a reasonable government official would not have understood the conditions in Hillsborough or Gilchrist County jails to be an unconstitutional deprivation of "a single human need." Wilson, 501 U.S. at 305, 111 S.Ct. at 2327. Thus, no reasonable government official would have concluded that contracting with these jails or transporting Jordan to them was a violation of Jordan's constitutional rights.
 
 IV. Conclusion
 
 33
 Determining when overall conditions of confinement are "sufficiently serious" to violate the constitution demands a fact-intensive analysis. It involves the application of vague "contemporary standards of decency" to an amorphous collection of circumstances, and it is often a very difficult task for a court to perform. Absent a court ruling, we would expect a reasonable government official to "know" that overall conditions of confinement are clearly unconstitutional only in a truly extreme case. This is not such a case. Because a reasonable government official in one of the marshals' positions would not have understood his actions to violate Jordan's constitutional rights in light of the clearly established law at that time, the district court erred in denying the marshals' motion for summary judgment based on qualified immunity.
 
 
 34
 The district court's December 1990 order denying the Defendants-Appellants' motion for summary judgment, No. 91-3042, is REVERSED. The Defendants-Appellants' appeal of the district court's denial of their motion to reconsider the summary judgment order, No. 92-2009, is DISMISSED as MOOT.
 
 
 35
 CLARK, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 36
 I disagree with the majority's conclusion that "a reasonable government official would not have understood the conditions in Hillsborough or Gilchrist County jails to be an unconstitutional deprivation of a 'single human need.' " Majority Op. at 1567. As I discuss in part I below, the record establishes that the conditions in the county jails were sufficiently serious to present this issue to a jury. Thus, I dissent from the majority's conclusion that Marshal Joseph Enders, the individual responsible for Jordan's placement in the county jails, is entitled to qualified immunity. I concur, however, in the majority's conclusion that the marshals who transported Jordan to the county jails are entitled to qualified immunity, as these marshals had no responsibility either for the conditions of the jails or for Jordan's placement in the jails.
 
 I. Marshal Joseph Enders
 
 37
 It is my view that the district court was correct in denying the motion for summary judgment filed on behalf of Marshal Joseph Enders. Enders was responsible for contracting with the county jails for the housing of federal prisoners and, therefore, was responsible for placing Jordan and other federal prisoners in the county jails. At the time of Jordan's detention in 1986, it was clearly established that a government official in such a position of responsibility could not "take actions that are indifferent to the health and safety of individuals detained before trial." Parker v. Williams, 862 F.2d 1471, 1477 (11th Cir.1989) (holding that this law was clearly established by 1984). The record in this case establishes genuine issues of material fact as to whether Enders should have known that the conditions in the county jails so threatened the health and safety of federal prisoners detained therein as to violate the Constitution.
 
 
 38
 Enders served as Assistant Director for Operations Support for the United States Marshals Service. As such, he was the authorizing official for the United States Marshals Service on intergovernmental agreements with local jails for housing federal prisoners. It is Enders who authorized and signed the contract with Hillsborough County jail on behalf of the Marshals Service. This contract specifically provides: "The County agrees to allow periodic inspections of the facility by U.S. Marshals Service Inspectors." (R1-10 Exh. A at Art. IX p 1). Enders, however, authorized submission of copies of Florida Department of Corrections' Inspection Reports in lieu of regular U.S. Marshals Service inspection reports. Thus, the record establishes an issue of fact whether Enders knew or should have known of the jail conditions reflected in the Florida Department of Corrections' Inspection Reports.
 
 
 39
 Jordan submitted to the district court copies of three Florida Department of Corrections' Inspection Reports for the Hillsborough County jail. According to these three reports, the jail was chronically overcrowded; it had an authorized capacity of 508 prisoners, but the reports show high counts of 891, 869, and 774. The reports list numerous deficiencies in the jail, and these deficiencies go uncorrected from one report to the next. For example, the most recent report lists the following deficiencies:
 
 CITABLE VIOLATIONS:
 
 40
 1. Previous deficiencies remain uncorrected.
 
 
 41
 2. The facility's population exceeds the cell-by-cell or room-by-room capacity as established and approved by the Department of Corrections.
 
 
 42
 3. Housing standards do not conform to the applicable standards....
 
 
 43
 4. Documented physical sight checks by correctional officers of medical staff persons exceeded intervals of fifteen minutes.
 
 
 44
 5. Cell illumination is not at least 30 foot candles at 30 inches above the floor.
 
 
 45
 6. Plumbing fixtures do not meet the required number per cell or prisoner ratio.
 
 
 46
 7. All plumbing fixtures are not clean, in good repair and operational.
 
 
 47
 8. Utility closets, pipe chases, and corridors are not kept clean and free of clutter.
 
 
 48
 9. Food service operations do not conform to the acceptable standards....
 
 
 49
 10. All food service equipment was not clean and in good repair.
 
 
 50
 11. All prisoners are not furnished a bed.
 
 
 51
 12. Sanitation standards do not conform to applicable standards....
 
 
 52
 13. Clutter and litter has not been eliminated in all areas of the facility.
 
 
 53
 14. Cell bars are not clean.
 
 
 54
 15. Walls are not kept clean and free of objects which provide hiding places for vermin.
 
 
 55
 16. Windows, sills, and screens are not kept clean and in good repair.
 
 
 56
 17. The facility was not found to be free of vermin.
 
 REPORTABLE VIOLATIONS:
 
 57
 1. During the admission and booking process prisoners are not examined for contraband and body lice and permitted to bathe.
 
 
 58
 (R1-38 Exh. 5 at 1-2 (regulation citations omitted)).
 
 
 59
 In response to the earliest of the three inspection reports, the Hillsborough County Sheriff said:
 
 
 60
 Overcrowding has been addressed by the court. Judge Patterson has issued an order to reduce the jail population to the authorized capacity by June 1986.
 
 
 61
 (R1-38 Exh. 3 Attach.). The two subsequent reports, both of which post-date June 1986, show that the jail population was not reduced to authorized capacity; indeed, both reports show that the jail remained hundreds of inmates over capacity. In response to the most recent report, the Sheriff conceded:The overcrowded conditions continue to make total compliance ... unattainable.
 
 
 62
 (R1-38 Exh. 5 Attach.).
 
 
 63
 In addition to the three Florida Department of Corrections' Inspection Reports, Jordan also submitted to the district court a copy of a Notice of Violation regarding the Hillsborough County jail issued by the State Fire Marshal's Office. According to this Notice of Violation, there were 131 inmates sleeping on the floor of the jail in such a manner as to impede the exiting path of travel from prison cells and from the jail's second level to the main level. The record does not reflect what steps, if any, were taken in response to this Notice of Violation.
 
 
 64
 The three inspection reports and the Notice of Violation confirm Jordan's allegations regarding the conditions in the Hillsborough County jail. He alleged:
 
 
 65
 Sleepin (sic) on the floor on a mattress might be conceived as all right, but not having to contend with roaches and rodents and filth, as was done at the Hillsborough County jail.
 
 
 66
 The Inspection Report of the Fire Marshall in Tampa of the Hillsborough [jail] puts the overcrowning (sic) in a different perspective as it more than created a dangerous situation.
 
 
 67
 . . . . .
 
 
 68
 Plaintiff will admit that it is not necessasily (sic) illegal for pretrial detainees to sleep on mattress on floor "without pedestal" but not with the infestation of roaches and rats and the overcrowding that makes it a fire hazard and the filthy conditions of the floors and showers.... Then the sleeping on filthy mattresses, being fed from a kitchen that is shown to be unclean....
 
 
 69
 . . . . .
 
 
 70
 The Hillsborough County (main) jail kept the lights on 24 hours a day in 6N2 and the television going 24 hours a day, over run with roaches, and had to threaten guards for cleaning supplies to clean the crud out of showers. Between 28 and 30 men in a 16 man tank, so overcrowded that it was wall to wall mattresses.
 
 
 71
 . . . . .
 
 
 72
 Plaintiff submits to this honorable court that when the tank in the jail was overcrowded; that no one could move about without stepping on someone, that all the beds were full, that the prisoners were sleeping on the floor between beds, next to toilets, showers, and between the tables in the dayroom and on the tables in the dayroom.
 
 
 73
 . . . . .
 
 
 74
 To wake up at night and have roaches crawling on you, or to have to wake someone up to keep from urinating on them, or to have to threaten jail officers for material to clean up these places with lawsuits. And this was done time and time again to literally have to threaten jail guards, seargents (sic), etc. to have it sprayed for roaches, rats and other vermin.
 
 
 75
 (R1-44 at 3-5; R1-36 Attach.; R1-38 at 13).
 
 
 76
 Neither Enders nor any of the other defendants offered any evidence to controvert Jordan's allegations and proof regarding the conditions of the Hillsborough County jail.
 
 
 77
 The majority, reversing the district court, conclude that Jordan's uncontroverted allegations and evidence do not give rise to a genuine issue of material fact as to whether Enders should have known that the prison conditions were unconstitutional. The majority relies on Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir.1985), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). In Hamm, the inmate complained that the population of the DeKalb County jail at times exceeded the facility's design capacity, that at times he slept on an eating table or on a mattress on the floor, that the floor and linens provided were unsanitary, that the food occasionally contained foreign objects and failed to meet applicable food preparation standards, and that he was denied adequate medical treatment. The district court granted the county's motion for summary judgment on the medical care claims; however, the court denied the motion for summary judgment on the issues of overcrowding and the adequacy of the jail's food service. The case went to trial on these latter issues. Following the nonjury trial, the district court concluded that the overcrowded conditions at the DeKalb County jail had not deprived Hamm of his constitutional rights. This court affirmed.
 
 
 78
 The overcrowded conditions described in Hamm are not as oppressive as those presented in this case. For example, there is no indication in the Hamm opinion that the overcrowded conditions at the DeKalb County jail gave rise to fire safety concerns, that the DeKalb County jail had a chronic problem with vermin, or that inmates at the DeKalb County jail were forced to sleep next to unsanitary toilets and showers. Moreover, the district court in Hamm denied the defendant's motion for summary judgment as to the overcrowded conditions; the court found that these conditions did not violate Hamm's constitutional rights only after a trial on the merits. Thus, the majority's reliance on Hamm to reverse the district court's denial of summary judgment in this case is misplaced.
 
 
 79
 To prove a constitutional violation based on prison conditions, an inmate must show that the conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise...." Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). The overcrowded conditions about which Jordan complains at the Hillsborough County jail impact primarily upon sleeping conditions. Jordan complains that he and other inmates at the Hillsborough County jail were forced to sleep on filthy mattresses on floors infested with roaches and rats, in public passageways designated as fire exits, next to filthy toilets and showers, and in rooms where lights burn and televisions blare 24 hours a day. Certainly, sleep is an "identifiable human need," and these complaints are sufficient to raise a genuine issue of material fact as to whether Enders reasonably should have known that inmates at the Hillsborough County jail were deprived of a minimally safe and adequate place to sleep. Cf. Hamm, 774 F.2d at 1573 (recognizing an inmate's constitutional right to minimally adequate living space). Accordingly, I would affirm the district court's denial of Enders' motion for summary judgment and remand the case for trial of Jordan's case against Enders.
 
 II. The Transporting Marshals
 
 80
 I agree with the majority that the marshals who transported Jordan to the county jails are entitled to qualified immunity, but I reach that conclusion for reasons different than those advanced by the majority. In transporting Jordan, these marshals acted pursuant to orders from the United States Marshal for the Middle District of Florida, under whom they served. If they had not obeyed these orders, they would have been fired and rightly so. These marshals had neither the responsibility to decide nor the ability to affect where Jordan and other federal prisoners were housed.
 
 
 81
 The facts of this case are similar to those presented in Walton v. City of Southfield, 995 F.2d 1331 (6th Cir.1993). In Walton, the plaintiff, a woman who had been arrested on a traffic charge, sued the arresting officers for invasion of privacy because the bathroom at the county jail where she was detained was exposed to the view of male officers and prisoners. In reversing the district court's denial of summary judgment in favor of the officers, the Sixth Circuit said:
 
 
 82
 We need not address whether there is any federal constitutional or statutory right of access to a private bathroom in a jail or right of seclusion from male persons in a jail while using a toilet. Officer Birberick and Officer Castleman did not violate any clearly established right of Walton's merely by delivering her to the jail. This jail was run by Oakland County, and Southfield police officers were directed to bring detainees to this jail. These officers had no control over the jail's design, and no ability to permit arrestees to use other facilities. Therefore, the officers clearly were entitled to qualified immunity on this claim because a reasonable officer would not have known that it was unlawful to take an arrestee to the designated jail.
 
 
 83
 Id. at 1341 (footnote omitted). Like the defendant officers in Walton, the transporting marshals in this case were directed to take Jordan and other federal prisoners to certain county jails. The marshals had no control over the conditions at these jails and no ability to direct prisoners to other facilities. Thus, the marshals were entitled to qualified immunity because a reasonable officer in their position would not have known that it was unlawful to take a prisoner to the designated jail. See also Woods v. City of Michigan City, Indiana, 940 F.2d 275, 281 (7th Cir.1991) (officers entitled to qualified immunity because it was not unreasonable for them to follow directive of state court judge, even when directive was contrary to state law); Vela v. White, 703 F.2d 147, 152 (5th Cir.1983) (holding that arresting officer who was acting on orders from his supervisor was entitled to qualified immunity, court said: "Under the circumstances of this case, it would not be fair to force [the defendant] to either violate a direct order or else stop and interrogate [his supervisor] as to the reasons for his order, at the risk of being held liable for damages for an unlawful arrest.").
 
 
 84
 I do not mean to suggest that a defendant is entitled to immunity merely upon proof that he or she was acting pursuant to orders. This is not and should not be the law. See Putman v. Gerloff, 639 F.2d 415, 422-23 (8th Cir.1981) ("The fact that actions are taken pursuant to orders and instructions is not a defense in and of itself, although it may be relevant to a claim of good faith and the defense of qualified immunity."). Defendants even concede in their brief on appeal: "We are not contending that deputy Marshals are entitled in all cases to carry out their orders without question." (Appellants' Brief at 38). On the facts of this case, however, I would conclude that the transporting marshals could not reasonably be expected to understand that they violated the law merely by obeying orders and delivering Jordan to the Hillsborough and Gilchrist County jails. It is Enders, the member of the Marshals Service who permitted and authorized federal prisoners to be housed in these jails, who should be liable, if he knew of the conditions there.
 
 
 
 [1]
 Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [2]
 Counsel for all parties have directed us to the affidavits and documents submitted by the parties to "flesh out" Jordan's claims
 
 
 [3]
 Moreover, the continuing validity of Riley is doubtful, see Howell v. Evans, 922 F.2d 712, 717-18 (11th Cir.), vacated after settlement, 931 F.2d 711, 712 (11th Cir.1991), particularly in light of the Supreme Court's subsequent emphasis that qualified immunity "ordinarily should be decided by the court long before trial." Hunter, 502 U.S. at ----, 112 S.Ct. at 537