**Natalie SIMS, a minor, By and Through her parents and next friends Charles and Sheila SIMS, Plaintiff,**

v.

**Ashley FOREHAND, et al., Defendants.**

**Civil Action No. 98–D–623–S.**

United States District Court,
M.D. Alabama,
Southern Division.

Sept. 5, 2000.

John L. McClung, Lindsey & McClung, Elba, AL, for plaintiffs.

Bart Gregory Harmon, Webb & Eley, P.C., Montgomery, AL, Gary Clayborn Sherrer, Farmer, Farmer, Malone & Sherrer, P.A., Dothan, AL, Kendrick E. Webb, Webb & Eley, P.C., Montgomery, AL, for defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Defendants Ashley Forehand and Jackie Smith's ("Forehand" and "Smith," individually, "Defendants," collectively) Motion For Summary Judgment ("Mot."), together with a supporting Memorandum Brief ("Br."), both filed December 28, 1999. Plaintiff Natalie Sims ("Sims"), a minor, by and through her parents, filed a Response To Defendants' Motion For Summary Judgment ("Resp.") on January 10, 2000. Defendants filed a Reply on January 18, 2000. After careful

consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion is due to be denied in part and granted in part.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). The Parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248, 106 S.Ct. 2505; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323, 106 S.Ct. 2548 (citing FED. R.CIV.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324, 106 S.Ct. 2548 (citing FED.R.CIV.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." FED.R.CIV.P.

56(e); *see also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## III. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

This lawsuit arises from the strip search of Sims, which occurred during the execution of a search warrant at a trailer in Houston County, Alabama, on the evening of May 31, 1996. Smith, a deputy sheriff with the Houston County Sheriff's Department, strip searched Sims, an occupant in the trailer who was not named in the search warrant. In the court's Memorandum Opinion And Order entered in this case on December 9, 1999, the court ruled on Smith and Forehand's Motion To Dismiss Amended Complaint.[1] In *Sims I*, the issue before the court was whether Smith and Forehand were entitled to qualified immunity on Sims' § 1983 constitutional claims asserted against them in their individual capacities. In assuming as true the allegations in Sims' Amended Complaint,[2] the court found that Smith and Forehand were not entitled to qualified immunity on the following three of Sims' constitutional claims: (1) Sims' Fourth Amendment unlawful detention claim; (2) Sims' Fourth Amendment unreasonable search claim; and (3) Sims' Fourth Amendment excessive force claim.[3]

While denying Defendants' Motion To Dismiss Amended Complaint, the court in *Sims I* noted that "[o]ne of the purposes of ... qualified immunity ... is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" *Sims I*, 84 F.Supp.2d at 1284 (quoting *Anderson v. Creighton*, 483 U.S. 635, 646–47 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In order to effectuate this purpose, the court limited discovery "tailored specifically to the question of ... qualified immunity" and whether any genuine issues of material fact existed surrounding the reasonableness of Smith and Forehand's alleged conduct. *Id.* Thus, the court granted Smith and Forehand leave to file a motion for summary judgment if, after conducting limited discovery, they believed that additional evidence existed outside the pleadings which would entitle them to qualified immunity. *Id.* Having conducted limited discovery, Smith and Forehand filed the instant Motion and have submitted evidence which they assert demonstrates their entitlement to qualified immunity.

Construed in the light most favorable to Sims, the evidence reveals the following.[4] On May 31, 1996, Forehand, a deputy sheriff narcotics investigator with the Houston County Sheriff's Department, ob-

---

1. The court's Memorandum Opinion And Order entered on December 9, 1999, is published at *Sims v. Glover*, 84 F.Supp.2d 1273 (M.D.Ala.1999). For brevity, the court will refer to this Memorandum Opinion And Order as *Sims I*.

2. In assessing the merits of a motion to dismiss, the court cannot look outside the complaint and must assume that all the factual allegations set forth in the complaint are true. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir.1990). Moreover, at the motion to dismiss stage, all factual allegations must be construed in the light most favorable to the plaintiff. *See, e.g., Brower v. County of*

*Inyo*, 489 U.S. 593, 598, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

3. The court dismissed all other claims, including Sims' causes of action brought under the Fourteenth Amendment's Equal Protection and Due Process clauses and the Eighth Amendment's prohibition against cruel and unusual punishment. *See Sims I*, 84 F.Supp.2d at 1285–88.

4. The court notes that, in ruling on Smith and Forehand's Motion For Summary Judgment, the court has carefully examined all submissions by the Parties and has construed them in the light most favorable to Sims, the nonmoving party. *See Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992)

tained a search warrant. (Defs.' Ex. B; Forehand's Dep. at 11.) The warrant authorized a search for narcotics "on the person of Christina Jarrard" ("Jarrard") and "in and upon" Jarrard's trailer located in Houston County, Alabama. (Defs.' Ex. B.) The warrant did not authorize the search of any person other than Jarrard. (*Id.*)

The warrant was issued upon an affidavit by Forehand. (*Id.*) In his affidavit, Forehand stated that he had received certain information from a reliable informant. The informant told Forehand that Jarrard was keeping marijuana at her trailer and that the informant had, within the past 72 hours, seen Jarrard in possession of marijuana at her trailer. (*Id.*)

Forehand executed the warrant on May 31, 1996, with the assistance of Smith and deputy sheriffs Tim Miller ("Miller"), Dave Elkins ("Elkins"), and Randy Anderson ("Anderson"). (Forehand's Dep. at 14.) During the execution of the warrant, the assisting officers, including Smith, were acting under Forehand's direction.[5] (*Id.* at 12.)

At approximately 6:15 p.m. on May 31, 1996, Forehand, Smith, Miller, Elkins and Anderson proceeded to Jarrard's trailer. (*Id.* at 13.) Miller knocked on the front door of Jarrard's trailer. (*Id.* at 14.) Forehand was standing "directly behind" Miller, with Smith and Elkins positioned at the back door. (*Id.* at 15–16; Smith's Dep. at 10.) After knocking and announcing his presence and purpose, Miller waited approximately 30 seconds before Jarrard opened the door. (Defs.' Ex. A; Forehand's Dep. at 14.) While waiting, Miller

and Forehand heard "a lot of movement inside the trailer." (Forehand's Dep. at 15.) Also, through a window in the door, Miller could see "several people moving around inside." (Defs.' Ex. A.)

When Jarrard opened the door, Miller entered the trailer first, followed immediately by Forehand. The front door opened into the living room which adjoined the kitchen. (Smith's Dep., Defs.' Ex. 1.) Miller then walked through the kitchen and to the rear of the trailer, where he unlocked the back door to let Smith and Elkins inside.[6] (Smith's Dep. at 11.)

Once inside the trailer, Miller and Forehand conducted a protective sweep to determine the number of individuals in the trailer. Two males were sitting on the floor in the living room where Miller and Forehand had entered the trailer, and Forehand also observed two females when he "scann[ed]" the room. (Forehand's Dep. at 16–17.) Forehand secured these individuals, while Miller proceeded to the rear hallway, where he saw a third female, later identified as Sims.[7]

Miller saw Sims walking out of the bathroom with a beer in her hand.[8] (Sims' Dep. at 13–14.) As Miller led Sims to the front of the trailer, he told Forehand that he "caught" Sims coming out of the bathroom with a beer in her hand. (Forehand's Dep. at 19–20.) At that point, Forehand "grabbed" Sims' arm and led her into the kitchen where the officers had assembled the four other occupants. (Sims' Dep. at 16.)

Smith, who had remained in the kitchen after entering, searched this area for narcotics. Smith, however, found no evidence

---

**5.** The court notes that the validity of the search warrant is not at issue in this case.

**6.** Anderson entered the trailer shortly thereafter. (Forehand's Dep. at 14.)

**7.** There were five people (three females and two males) in the trailer when the deputies arrived to execute the search warrant. (Sims' Dep. at 30, 48; Forehand's Dep. at 22; Smith's Dep. at 12.)

**8.** According to Miller, he heard the toilet running as Sims left the bathroom. Sims, however, denies that the toilet was running or that she flushed it. (Sims' Dep. at 17.) In construing the evidence in the light most favorable to Sims, as the court must on a motion for summary judgment, the court does not consider Miller's testimony on this point in ruling on Defendants' Motion For Summary Judgment.

of narcotics in the kitchen. (Smith's Dep. at 16–18.) Around the same time that Smith was searching the kitchen, either Elkins or Miller, at Forehand's request, obtained the names, addresses and ages of the five occupants. (Forehand's Dep. at 22, 23.) All were minors, except for Jarrard who was 20 years old. (Forehand's Dep. at 22, 40; Defs.' Ex. A, at 2.) Smith was 16 years old. (Sims' Dep. at 6.) Forehand then asked the officers to "start running warrant checks" on the five occupants and also to ascertain whether any of the minors had outstanding "juvenile pick up orders." (Forehand's Dep. at 21–22.) Also, during this timeframe, Forehand read the five occupants their Miranda rights[9] (Forehand's Dep. at 38; Smith's Dep. at 31) and began "scanning ... the readily visible areas" for evidence of narcotics. (Forehand's Dep. at 22–23.)

Next, Elkins made Sims and the other four occupants take off their shoes and socks. (Sims' Dep. at 50; Forehand's Dep. at 26, 31.) Then, the officers conducted a patdown frisk of Sims and the two males, but not of the other two females.[10] (Sims' Dep. at 51.) The patdown frisk of Sims and the two males, also revealed nothing—neither evidence of drugs nor weapons. (Sims' Dep. at 50–51; Forehand's Dep. at 24.)

Then, at Forehand's direction, Smith conducted individual strip searches of the two males in a back bedroom of the trailer outside "the view of the females." (Smith's Dep. at 19–20; Forehand's Dep. at 33–34.) The strip searches, which lasted approximately five minutes each, uncovered no incriminating evidence. (Smith's Dep. at 22–24.) After Smith strip searched the two males, they returned to the living room.

What occurred next is at the heart of this lawsuit and forms the basis of Sims' claims. Smith then "motioned" for Sims to go to the back bedroom. (Sims' Dep. at 55–56.) When Sims went into the bedroom, Smith stood in the open doorway. (Id. at 57.) Sims explains the strip search as follows:

> [Smith] asked if he could see my shirt and I handed it to him and he searched it. And then my bra, he searched it. And then my shorts, he searched those. And my panties, he searched those. And I had to turn around and face the wall and I had to bend over and cough three times. And then he let me put my clothes back on.

(Id. at 58.) Sims, who was too embarrassed to "look up," kept her "head down" during the strip search. (Id.) According to Sims, Smith never "touched" her or made "any inappropriate comments." (Id.)

When Sims returned to the living room, she saw Forehand in the "kitchen area," which was in the same place Forehand was standing when Smith summoned Sims to the back bedroom for the strip search.[11] (Id. at 59–60.) When Smith summoned Sims for the strip search, Sims was in the living room. (Sims' Dep. at 52.) As stated, the living room and kitchen of the trailer adjoin and are not separated by a wall. (Sims' Dep., Defs.' Ex. 1.) In order to walk to the back bedroom where Smith conducted the strip search, Sims had to walk through the living room and, thus, passed Forehand. (Id.)

Smith denies that he strip searched Sims. (Smith's Dep. at 20.) According to Smith, after the males left the back bedroom, Sims "came in the room and she started like she was going to take her shirt off and [Smith] stopped her and told her not to." (Id. at 25.) Instead, Smith told

---

9. Forehand jointly read each of the five occupants their Miranda rights, all of whom indicated that they understood those rights. (Forehand's Dep. at 38.)

10. The court notes that Forehand states that he instructed Elkins to patdown only the two

males for weapons, not the females. (Forehand's Dep. at 23, 39.)

11. For reasons not appearing in the record, the other two female occupants were neither strip searched nor subjected to a patdown search.

Sims "to turn her pockets inside out and she did."[12] (*Id.*)

After Smith completed the strip searches, Forehand, who had advised Jarrard of her Miranda rights, questioned Jarrard.[13] (Forehand's Dep. at 33, 37–38, 44.) Forehand explained to Jarrard that the deputies were "going to have to do a long extensive search" for marijuana. (*Id.* at 44.) In response, Jarrard confessed that she was "warned" about the search[14] and that there was "some contraband in the [outside] trash can." (*Id.* at 33, 44, 46; Sims' Dep. at 45.)

Subsequently, Forehand recovered drug paraphernalia from the outside trash can. (Smith's Dep. at 27; Forehand's Dep. at 33.) Additionally, after the strip searches, marijuana residue and seeds were found in the trailer. (Defs.' Ex. A., at 2; Forehand's Aff. at 2; Sims' Dep. at 42.)

At 7:15 p.m., the officers completed their search. No one was arrested. (Defs.' Ex. A at 2; Forehand's Dep. at 49.)

## IV. DISCUSSION

The claims remaining in this lawsuit are Sims' Fourth Amendment claims brought under 42 U.S.C. § 1983 against Smith and Forehand in their individual capacities.[15]

---

**12.** Sims and Smith's versions of the facts are in sharp contrast. However, because the case is before the court on summary judgment, all disputed facts are resolved in favor of Sims, the nonmovant. *See Welch,* 951 F.2d at 1237

**13.** During the hour that the deputies were at Jarrard's trailer, Forehand spoke to each of the five individuals. (*Id.*)

**14.** As explained by Sims, "somebody" rode by the trailer on a bicycle and told Jarrard that the "cops were coming." (Sims' Dep. at 23–25.)

**15.** Section 1983 provides that

[e]very person who, under color of a statute ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

As stated, Sims brings the following three Fourth Amendment claims:[16] (1) a Fourth Amendment unlawful detention claim; (2) a Fourth Amendment unreasonable search claim; and (3) a Fourth Amendment excessive force claim. The issue before the court is whether Smith and Forehand are entitled to summary judgment on each of Sims' three Fourth Amendment claims pursuant to the well-established doctrine of qualified immunity. The court will address each claim after setting forth the general principles of law applicable in § 1983 qualified immunity actions.

### A. *The Qualified Immunity Standard*

 Qualified immunity is an affirmative defense to a § 1983 action against a government official sued in his or her individual capacity. *See Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir.1998); *see also Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1184 n. 16 (11th Cir.1994). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights," rather it provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

**16.** The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. 4; *see also United States v. McBean,* 861 F.2d 1570, 1573 (11th Cir.1988) ("The Fourth Amendment to the Constitution prohibits, on its face, unreasonable searches and seizures[.]"). The Fourth Amendment is applicable to the states through the Fourteenth Amendment. *See Michigan v. Summers,* 452 U.S. 692, 694 n. 2, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. The first inquiry concerns "whether the defendant government official was performing a discretionary function." *Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir.1997). A government official acts within his or her discretionary authority if the challenged actions were (1) "undertaken pursuant to the performance of his [or her] duties" and (2) "within the scope of [his or her] authority." *Lenz v. Winburn,* 51 F.3d 1540, 1545 (11th Cir.1995) (quoting *Rich,* 841 F.2d at 1564). The determination that an officer was acting within his or her discretionary authority is a "low hurdle" to clear. *Godby v. Montgomery Co. Bd. of Educ.,* 996 F.Supp. 1390, 1400 (M.D.Ala.1998) (citing *Jordan v. Doe,* 38 F.3d 1559 (11th Cir.1994)). If a defendant satisfies this hurdle, the burden shifts to the plaintiff to demonstrate under the second prong that the official's actions " 'violated clearly established constitutional law' " or a federal statute. *Id.*

■ Under the second prong, the court must determine whether the applicable law was clearly established at the time of the challenged action. This is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit and, in this case, the Supreme Court of Alabama. *See D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir.1995); *see also Courson v. McMillian,* 939 F.2d 1479, 1498 n. 32 (11th Cir.1991). If a question of law is unsettled, it is not clearly established, and, thus, the defendant is entitled to qual-

ified immunity. *See Daniel v. Taylor,* 808 F.2d 1401, 1403 (11th Cir.1986).

For a case to clearly establish the law, the relevant inquiry is "fact specific." *Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994). A plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir. 1994); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right").

■ "[T]his is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Madiwale,* 117 F.3d at 1324 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). Absent a controlling and factually on-point case, a plaintiff can overcome qualified immunity only when "the official's conduct lies so obviously at the very core" of what the constitutional provision forbids "that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997) (citing *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

Summary judgment is appropriate "if either (1) the applicable law was not clearly established at the time of the alleged violation, or (2) the plaintiff fails to demonstrate the existence of genuine issues of material fact as to whether the defendant public official's actions violated the clearly-established law." *Harrell v. Decatur County,* 41 F.3d 1494 (11th Cir.1995), vacating and adopting dissent in 22 F.3d 1570, 1578 (11th Cir.1994).

## B. *Application*

The court now turns to the two-step inquiry for determining whether Smith and Forehand are entitled to qualified immunity on Sims' Fourth Amendment claims. *See Rich,* 841 F.2d at 1563–64. For the reasons to follow, the court concludes that Forehand and Smith are entitled to qualified immunity on Sims' Fourth Amendment unlawful detention claim, but not on Sims' Fourth Amendment unlawful search and excessive force claims.

### 1. *Scope of Discretionary Authority*

The first prong of the qualified immunity analysis requires a showing that the government official was acting within the scope of his or her discretionary authority at the time of the alleged unconstitutional conduct. *See Jordan,* 38 F.3d at 1565. Here, Sims "concede[s]" that deputies Smith and Forehand were acting within the scope of their discretionary authority when the alleged constitutional violations occurred. (Resp. at 4.) Thus, the court finds that the first element under the qualified immunity analysis is satisfied. *See Godby v. Montgomery Co. Bd. of Educ.,* 996 F.Supp. 1390, 1400 (M.D.Ala.1998) (finding that the determination that an officer was acting within his or her discretionary authority is a "low hurdle" to clear). Therefore, the court need only focus its analysis on the contested second prong.

### 2. *Clearly Established Law*

#### a. Fourth Amendment unlawful detention

■ In her Amended Complaint, Sims alleges that her detention at the trailer was unnecessarily prolonged and was without justification. (Am.Compl.¶ 15B.) Thus, in bringing this allegation, Sims challenges the legitimacy of the length of the detention.

At this stage, Sims bears the burden of proving that Forehand and Smith violated clearly established Fourth Amendment law. *See Godby,* 996 F.Supp. at 1400. Sims argues that *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), clearly establishes that Defendants "detained" her "longer than necessary to conduct a search of the trailer" and "detained" her "after the search was completed." (Resp. at 3.)

In *Summers,* law enforcement officers obtained a warrant to search a house. 452 U.S. at 693, 101 S.Ct. 2587. As the officers were approaching the house, they saw the defendant walking down the front steps away from the premises. *Id.* The officers had observed the defendant exit the house, identified themselves, and explained their purpose. *Id.* at 693 & n. 1, 101 S.Ct. 2587. The officers requested the defendant's assistance in gaining admission to the house in order to execute the search warrant. *Id.* at 693, 101 S.Ct. 2587. The officers detained the defendant inside the home along with the other residents while the search was conducted. *Id.* The officers found heroin in the basement and, after ascertaining that the defendant owned the house, arrested him. *Id.* In a search incident to arrest, the officers found additional heroin in the defendant's coat pocket. *Id.* The defendant, who was charged with possession of heroin, moved to suppress the drugs. *Id.* at 694, 101 S.Ct. 2587. As grounds for suppression, the defendant argued that the heroin was the product of an unlawful search and seizure because there was no justification for detaining the defendant during the search. *Id.*

The Supreme Court disagreed with the defendant, holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. 2587. The Supreme Court reached its decision after concluding that exigent circumstances—such as the risk of flight and harm to the officers—outweighed the intrusion on the

occupant's Fourth Amendment rights. *Id.* at 701–03, 101 S.Ct. 2587.

Sims asserts that, when the strip searches occurred, the officers had completed their search of the trailer and "remained" solely because Forehand "was convinced that illegal drugs were on the premises." (Resp. at 3.) Thus, according to Sims, it is at the point when Smith began the strip searches that her detention became prolonged and unlawful. For the following reasons, the court finds that *Summers* does not clearly establish the law as to the facts of this case and, therefore, Forehand and Smith are entitled to qualified immunity on Smith's unlawful detention claim.

■ For qualified immunity purposes, the question is whether the law was clearly established on May 31, 1996, that Smith's detention extended beyond the time necessary to search the premises.[17] According to Sims, deputies completed the search of the trailer before the strip searches began. Thus, the issue, as framed by Sims, is whether her detention was prolonged. It is difficult to ascertain a precise timeline of events, because during the search the five deputies were simultaneously performing different tasks. However, in construing all inferences in favor of Sims, the court finds that the evidence establishes in chronological order that the deputies searched the trailer, strip searched the males and Sims, questioned Jarrard and the other occupants, found drug paraphernalia in the trash can, found marijuana residue and seeds in the trailer, and then left the scene. Based on these facts, the issue becomes whether the intervening events, such as the strip searches and questioning of Jarrard, who was named in the search warrant, unnecessarily prolonged the search. In other words, were these events legitimate components of a lawful search or events which unconstitutionally extended the detention of Sims?

After careful consideration, the court finds that it need not resolve whether the search reasonably spanned before and after the strip searches or whether the questioning of Jarrard and the other occupants, which occurred after the strip searches, can be justified as normal incidents of the search. The court reaches this conclusion based on its finding that *Summers* does not clearly establish the parameters of the law regarding the *length* of Sims' detention. *See Daniel,* 808 F.2d at 1405 (recognizing that *Summers,* and even the Supreme Court's dicta therein that "possibly a prolonged detention ... might lead to a

17. The court notes that, while Sims acknowledges that *Summers* permits the detention of an "occupant" during the execution of a valid search warrant, she claims that her detention was unlawful because "occupant," as that term is used in *Summers,* refers only to a "resident" of the premises. (Resp. at 3–4.) The court disagrees with Sims that her status as a visitor, not a resident, is a distinction that disrobes Smith and Forehand of qualified immunity.

As Sims concedes, it is settled law under *Summers* that "occupants" of the premises being searched pursuant to a valid search warrant may be lawfully detained during the search. 452 U.S. at 705, 101 S.Ct. 2587. Although *Summers* involved the detention of a resident whose home was the subject of the valid search, the *Summers* court did not define "occupant" or hold that "occupant" was limited to residents only, not visitors. Other circuits, faced with the same argument that Sims raises, have held that the term "occu-

pant" under *Summers* does not refer only to a "resident" of the premises, but also to visitors on the premises. *See United States v. Fountain,* 2 F.3d 656, 663 (6th Cir.1993); *see also United States v. Pace,* 898 F.2d 1218, 1239 (7th Cir.1990); *United States v. Taylor,* 716 F.2d 701, 707 (9th Cir.1983).

Neither the Supreme Court of Alabama nor the Eleventh Circuit has addressed the issue of whether "occupant" includes only residents or both residents and visitors. Thus, the court finds that, at best, the law is unsettled in this circuit on this issue. When the law is unsettled, the law is not clearly established. *See Daniel,* 808 F.2d at 1403. Therefore, the court finds that it is not clearly established that Forehand and Smith could not detain Sims, as a visitor on the premises. Thus, the court finds immaterial Sims' emphasis on the resident-visitor distinction for purposes of deciding the qualified immunity issue.

different conclusion in an unusual case" did not clearly establish the law regarding the length of the detention of an occupant during a permissible search) (quoting *Summers*, 452 U.S. at 706 n. 21, 101 S.Ct. 2587). As made clear in *Daniel*, the length of the detention was not at issue in *Summers*. *See id.* Indeed, the *Summers* Court did not even indicate how long the detention lasted. Rather, the only issue in *Summers* was "whether the initial detention of [the defendant] violated his constitutional right to be secure against an unreasonable seizure of his person." 452 U.S. at 694, 101 S.Ct. 2587.

Because the sole issue decided in *Summers* was whether the initial detention was lawful, *Summers* does not speak to the length of the detention. Therefore, the court finds that, for purposes of resolving the applicability of qualified immunity, it is enough to recognize that the law is unclear as to when the length of the detention becomes prolonged and whether under these facts the deputies impermissibly extended the search. In other words, the court finds that the unsettled character of the law regarding the length of the detention demonstrates that the detention did not result in the violation of a clearly established right. Thus, the court need not decide whether Sims' detention was unconstitutional under the Fourth Amendment. Instead, as in *Daniel*, the court "just recognize[s] that the law is ambiguous as to when detention in conjunction with a lawful, premises search becomes impermissible." 808 F.2d at 1405. Accordingly, the court finds that Forehand and Smith are entitled to qualified immunity on Sims' Fourth Amendment unlawful detention claim.

b. Fourth Amendment unlawful search

In Count Two, Sims asserts that Smith's strip search of her on May 31, 1996, violated her Fourth Amendment right to be free from an unreasonable search. Sims claims that, not only is Smith liable to her for his unlawful strip search but that Forehand also is because he knew about the strip

search and failed to prevent it. (Resp. at 4.) In defense, Forehand and Smith assert that they are entitled to qualified immunity. Under § 1983, the standard for determining liability is different for Smith and Forehand. Thus, the court will separately address Sims' Fourth Amendment unreasonable search claim as it pertains first to Smith and then to Forehand. For the reasons to follow, the court finds that Forehand and Smith are not entitled to qualified immunity.

(i) Smith

■ In urging the court to deny qualified immunity to Smith, Sims contends that the strip search of her by Smith was "so blatantly unreasonable that any police officer would know that the actions were unconstitutional and unreasonable." (Resp. at 5, citing *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). Further, Sims asserts that, even if not factually similar in all material respects, *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), clearly establishes the parameters of what would and would not have constituted a permissible search of Sims. Based upon *Ybarra*, Sims argues that, at most, the evidence would support only a patdown search of her. (Resp. at 5.) Further, Sims points out that a patdown "was performed on [her], and nothing was found." (*Id.*) According to Sims, the patdown should have "end[ed]" any reason for further searching the person of [Sims]." (*Id.*)

In *Ybarra*, the Supreme Court held that, during the execution of a warrant for the search of a premises, the search of persons not named or described in the warrant, but found on the premises being searched, is not made lawful simply by their presence. 444 U.S. at 91, 100 S.Ct. 338. The law requires that probable cause exist to believe that such persons are themselves participants in criminal activity. *Id.* There, law enforcement officers obtained a search warrant authorizing the search of a tavern and the person of the bartender for evidence of controlled substance violations.

444 U.S. at 87–88, 100 S.Ct. 338. During the search, one officer conducted a pat-down search of a majority of the customers in the tavern. Ventura E. Ybarra ("Ybarra"), the appellant, was one of those customers. *Id.* at 88, 100 S.Ct. 338. In the course of the patdown of Ybarra, the officer seized heroin from his pants pocket. *Id.* at 89, 100 S.Ct. 338. Subsequently, Ybarra was indicted and convicted for unlawful possession of a controlled substance. *Id.*

The Supreme Court reversed the judgment of conviction on Fourth Amendment grounds and held as follows:

> It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.

*Id.* at 91, 100 S.Ct. 338 (internal footnote and citation omitted).

Defendants argue that, unlike the defendant in *Ybarra,* here, probable cause existed for the strip search of Sims, thus, entitling Smith to qualified immunity. In other words, Defendants assert that a reasonable officer in the same circumstances and possessing the same knowledge as Smith could have believed that probable cause existed for the strip search of Sims. *See Swint v. City of Wadley,* 51 F.3d 988, 995 (11th Cir.1995). Further, Defendants assert that there are no cases "arising out

of material similar facts, which would have put Smith on notice that his alleged decision to strip search Sims was unconstitutional." (Br. at 8.) According to Defendants, "[t]he cases from the United States Supreme Court and the Eleventh Circuit arise out of prison or school contexts. There is very little guidance given to the officer when this particular question arises in a search warrant context and whether there is reason to believe an occupant of the building to be searched has hidden incriminating evidence." (*Id.* at 8–9.)

Further, Defendants note that in *Sims I,* the court found that *Ybarra* clearly established the law as to the facts alleged in Sims' Amended Complaint. Based on the four corners of Sims' Amended Complaint, Defendants concede that the court "properly relied on *Ybarra*" to overrule Defendants' motion to dismiss. (*Id.* at 9.) However, at the summary judgment stage, where the court may consider evidence outside the pleadings, Defendants assert that the facts demonstrate that there are "more" facts, "a great deal more" facts, "which would have justified the strip search of Sims." (*Id.*)

The specific facts relied upon by Defendants in support of their contention that arguable probable cause existed for the strip search of Sims are as follows: (1) Sims was friends with the other four occupants in the trailer; (2) there was a 30-second delay before Jarrard opened the trailer door (Sims' Ex. 4); (3) after he announced his identity and intentions, Miller could see through a window in the door and observed "several people moving around inside" (*Id.*); (4) Sims appeared jumpy and nervous; (5) Sims initially lied to the officers about possessing a beer; (6) "[m]ost importantly," Miller saw Sims exit the bathroom, and he heard the toilet running as she walked out; and (7) "the officers, upon the word of a reliable, confidential informant, knew that drugs had been present in the trailer, and now could find no trace of them. It was reasonable to believe the occupants, especially Sims, had

attempted to hide incriminating evidence." (Br. at 10.)

For the reasons to follow, the court agrees with Sims that this is one of the exceptional cases where, based on the contours of the law, it should have been plainly obvious and "readily apparent" to Smith that his conduct was unlawful. *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 926 (11th Cir.2000); *see also Smith,* 127 F.3d at 1419 (Absent a controlling and factually on-point case, a plaintiff can overcome qualified immunity only when "the official's conduct lies so obviously at the very core" of what the constitutional provision forbids "that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw.") (citing *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). The court recognizes that its finding is based upon the "narrow exception" to the qualified immunity rule requiring the plaintiff to point to materially similar case law clearly establishing the law. *Priester,* 208 F.3d at 926. Although the "readily apparent" standard is difficult to meet, the court finds that on the facts of this case, the law was clearly established in May 1996 that what Smith did violated Sims' constitutional rights.[18]

In reaching its conclusion, the court has applied the standards set forth in Section IV.A, *supra,* as well as the following two principles of law. First, in determining whether Smith acted reasonably, the court must "consider not only the law established at the time of the relevant incident, but also 'the information possessed by the official at the time the conduct occurred.' " *Lancaster,* 116 F.3d at 1424–1425 (quoting *Suissa v. Fulton County,* 74 F.3d 266, 269 (11th Cir.1996)). Second, in Fourth Amendment cases where the defense of qualified immunity is raised, the standard is not "actual probable cause but only 'arguable probable cause.' " [19] *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir.1997) ("In order to be immune from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed."); *see also Jones v. Cannon,* 174 F.3d 1271, 1283 n. 3 (11th Cir.1999).

Based upon the record, read in the light most favorable to Sims, the court finds that Smith did not possess even arguable

---

**18.** For an example of a case satisfying the "readily apparent" standard, see *McMillian v. Johnson,* 88 F.3d 1554, 1564–65 (11th Cir. 1996) (vacated and amended on other grounds, 101 F.3d 1363 (11th Cir.1996)). There, the plaintiff contended that, by placing him on deathrow while he awaited trial, government officials violated his Fourteenth Amendment due process right to be free from punishment as a pretrial detainee. *Id.* at 1564–65. In denying the defendant-officials qualified immunity, the *McMillian* court reasoned as follows:

> We do not view the absence of a case factually similar to the extraordinary allegations in this case as an indication that the law was not clearly established that confining a pretrial detainee on death row to punish him is unconstitutional. [The Supreme Court's] prohibition on any pretrial punishment, defined to include conditions imposed with an intent to punish, should have made it obvious to all reasonable officials in [defendants'] place that holding [plaintiff]

on death row to punish him before he was tried violated [his] due process rights.

*McMillian,* 88 F.3d at 1565 (citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). For another example of a case that found the "clearly established" requirement satisfied and denied qualified immunity without citing a previous case with similar facts, *see Powell v. M.C. Lennon,* 914 F.2d 1459, 1464 (11th Cir.1990) (holding that a failure to remove a prisoner from an area after learning the area was contaminated with asbestos constituted deliberate indifference).

**19.** "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (citations and footnote omitted).

cause to strip search Sims. Specifically, the court finds that the seven factors relied upon Defendants are wholly inadequate to establish arguable probable cause and that a reasonable officer would have so known. Defendants' reliance upon the first factor is highly questionable. Whether or not Sims was friends with the other occupants, or in particular with Jarrard, who was named in the warrant, says nothing as to whether Sims possessed contraband. As made clear in *Ybarra*, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91, 100 S.Ct. 338. As demonstrated below, in this case, there is nothing "more."

Regarding the second and third factors, the court finds that they are not "particularized with respect to" Sims. *Ybarra*, 444 U.S. at 91, 100 S.Ct. 338. There is no evidence that Sims caused the 30–second delay in opening the door once Miller knocked. Likewise, Miller does not state that he saw Sims "moving around inside" the trailer prior to Jarrard opening the door. (Defs.' Ex. A.) Indeed, Sims states that, when the officers arrived, she was in the back and did not hear the knock on the door. (Sims' Dep. at 13, 15.) Thus, according to Sims, she did not know of the presence of law enforcement officers until they were in the trailer. Thus, it is difficult to see how the delay in opening the door and the scurrying movement Miller saw through the window can be linked to Sims in determining the existence of arguable probable cause for a strip search. In short, the court finds that Defendants have failed to connect these two factors to Sims.

Additionally, the sixth factor, which Defendants deem the "most important[ ]," is disputed, and, thus, Defendants' version is not appropriate for consideration on a motion for summary judgment. *See Hardin*, 957 F.2d at 848 (holding that on summary judgment, the court must consider the facts drawn from the pleadings, affidavits and depositions, in the light most favorable to the plaintiff). Sims denies Miller's contention that the toilet was running when she walked out of the bathroom. Specifically, Sims states that, when she was in the bathroom, the toilet was neither "running" nor did she flush it. (Sims' Dep. at 17.) Because Sims denies this allegation, the court must assume on summary judgment that Sims did not flush the toilet. Thus, at the summary judgment stage, the sixth factor cannot be used in determining whether arguable probable cause existed for the strip search of Sims. Finally, the court finds untenable Defendants' assertion that it was reasonable for the officers to assume Sims had drugs concealed on her body because no drugs were found in the trailer (i.e., the seventh factor). *See, e.g., Foote v. Spiegel*, 118 F.3d 1416, 1425 (10th Cir.1997) ("reject[ing] the proposition that it is reasonable to assume a person arrested for driving while under the influence of drugs has drugs concealed on his or her body simply because none were found in the vehicle or in a thorough patdown search.").

Thus, Defendants are left with the following facts: (1) that Sims appeared nervous, a trait that could reveal either involvement in criminal activity or just as easily fright at being detained by law enforcement officers; (2) that Sims was "friends" with Jarrard and the other occupants; and (3) that Sims had a beer in her hand but denied that it was her beer, a fact that, at most, lends support to a probable cause finding that Sims was engaged in underage drinking. Thus, even assuming that probable cause existed to believe that Sims was a minor consuming alcohol, there is no particularized reason, based upon these facts, to believe that she was concealing marijuana on her person. In other words, there is simply no evidence pointing to Sims as the individual who was hiding marijuana on her person.

Further, assuming *arguendo* that the officers had a right to conduct a patdown of Sims for weapons, the patdown did not reveal any incriminating evidence. Thus,

while a lawful frisk intended for protective purposes, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), may lead to information sufficient to establish probable cause for a full search, such is not the case here. *See, e.g., Guzman v. Estelle*, 493 F.2d 532 (5th Cir.1974) (holding that a search for narcotics may be justified where an officer's search for weapons unexpectedly produces evidence providing or contributing to probable cause to believe that the person being searched possesses narcotics); *Compare Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (holding that law enforcement officers may seize non-threatening contraband detected during a protective patdown search of the type permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), so long as the search stays within the confines of a valid *Terry* search). moreover, it was May, and Sims was wearing summer-type clothing, i.e., shorts and a shirt. (Sims' Dep. at 58.) The court finds that any incriminating evidence could have been discovered through the patdown search, without the need for a further strip search.

Considering the facts before it, the court finds that no particularized preexisting case is necessary to establish that Smith's strip search of Sims was unconstitutional. The court concludes that no reasonable officer could believe that, arguably, proba-ble cause existed for a strip search of Sims.[20] Thus, despite a factually similar case, given the extraordinary allegations in this case, the court finds that Smith is not entitled to qualified immunity on Sims' Fourth Amendment unreasonable search claim.[21]

### (ii) Forehand

Sims seeks to hold Forehand liable for authorizing or, at the very least, failing to prevent Smith's strip search of Sims. In defense, Forehand raises the defense of qualified immunity and bases his claim to qualified immunity on his lack of personal involvement in and his lack of knowledge of the strip search of Sims. For the following reasons, the court finds that genuine issues of fact exist as to whether Forehand violated clearly-established law. Thus, summary judgment is due to be denied. *See Brown v. Cochran*, 171 F.3d 1329, 1332 (11th Cir.1999).

■ The law was clearly established in May 1996 that law enforcement officers who are present at the scene and observe another officer violate an individual's constitutional rights may be held liable under § 1983 for "nonfeasance." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441 (11th Cir.1985). Liability attaches regardless of whether the officer is a supervisor

---

**20.** The court notes that, even assuming that probable cause existed, probable cause alone is insufficient to justify a search without a warrant. If probable cause alone justified a warrantless search, the Fourth Amendment's warrant requirement would be rendered meaningless as law enforcement officials would never have to possess a warrant where they had probable cause.

Rather, it is well established that searches conducted without a warrant "are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.'" *United States v. Juarez*, 573 F.2d 267, 272 (5th Cir.1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). These exceptions include: (1) plain view; (2) consent; (3) searches incident to a lawful arrest; (4) hot pursuit or emergency situations; (5) exigent circumstances; and (6) au-tomobile exception. *See Texas v. Brown*, 460 U.S. 730, 735–36, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). However, the court need not decide whether there are facts indicating that the warrantless search fits into any of the warrantless search exceptions, because the threshold requirement of arguable probable cause is not satisfied.

**21.** In ruling on Defendants' Motion For Summary Judgment, the court is merely deciding that, based upon Sims' version of the facts, Smith is not entitled to qualified immunity. As stated, whether Smith strip searched Sims is in dispute. The court, of course, expresses no opinion as to the credibility of either Smith or Sims. The resolution of that dispute is a matter for the finder of fact, not for the court on summary judgment.

or not. *See Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986).

Here, the court has already determined that any reasonable officer should have known that the strip search of Sims was unconstitutional, in violation of the Fourth Amendment. Thus, if Forehand authorized or knew about the strip search, then under a nonfeasance theory, he, just like Smith, is not entitled to qualified immunity. The issue, thus, is whether Forehand whom was present at the scene knew about the strip search.[22] Based on the following facts, the court finds that Forehand's knowledge is in dispute.

Forehand denies that he knew that Smith strip searched Sims. Forehand states that, prior to Sims being summoned for a strip search, he left the trailer "for just a minute," he thinks to get his camera from the trunk of his car. (Forehand's Dep. at 42–43.) When he returned from his car, Forehand says that he saw Sims "coming back down the hallway." (*Id.* at 42, 47; Smith's Dep. at 26–27.) Forehand then asked Elkins, "Where has [Sims] been?" (Forehand's Dep. at 42.) Elkins responded that he [Elkins] "sent her back there to see [Smith]." (*Id.*) Then, Forehand states that he asked Smith if Smith strip searched Sims, to which Smith responded "No." (*Id.*) Forehand says that, while he instructed Smith to strip search the males, he did not authorize a strip search of Sims. Further, Forehand states that, "[i]f he had seen any officer begin to strip search [ ] Sims, [he] would have prevented such a search."[23] (Forehand Aff. at 2.)

Sims, however, testified at her deposition that, when Smith summoned her to go to the back room with him, Forehand was in the kitchen also. (Sims' Dep. at 56, 59.) Sims then says that Forehand was in the same spot in the kitchen after the strip search. (*Id.* at 60.) If the facts are as Sims alleges, i.e., that Forehand was present both when Smith summoned her for the strip search and when she returned, it would be reasonable for a jury to conclude that Forehand knew what was going on, particularly since Forehand had just authorized Smith to strip search the two males in the back bedroom. Because a genuine issue of material fact exists on the issue of Forehand's knowledge, the court finds that summary judgment is due to be denied and that, at this stage, Forehand is not entitled to summary judgment.

c. Fourth Amendment Excessive Force

Sims also alleges that Smith and Forehand deprived her of "[f]reedom from the use of excessive and unreasonable force" when Sims strip searched her. (Am. Compl.¶ 15F.) Thus, Sims alleges that strip search of her constitutes both an unreasonable search and amounts to excessive force. In moving for summary judgment, neither Smith nor Forehand have challenged the propriety of Sims' excessive force claim or questioned the court's finding in *Sims I* that: (1) Smith required Sims to be strip searched based on his status as a law enforcement officer, that said action constituted a show of authority sufficient to allege force, and that, based upon these facts, Sims stated a claim for excessive force under the Fourth Amendment; and (2) that Smith and Forehand were not entitled to qualified immunity. Accordingly, Sims' Fourth Amendment excessive force claim against Smith and Forehand stands and, to the extent that

---

**22.** The court notes that it is undisputed that Forehand did not personally participate in the strip search but that he was one of the deputies who executed the search warrant at Jarrard's trailer on May 31, 1996.

**23.** According to Forehand, he was not aware that Sims had alleged that she was strip searched until more than a month after the execution of the search warrant, "when a complaint was made to Sheriff Glover." (Forehand's Dep. at 43.) Further, Forehand points out that "[t]he policy of the Houston County Sheriff and Sheriff's Department prohibits and prohibited the strip searching of female subjects by male deputies, ... as well as male subjects by female deputies...." (Forehand Aff. at 2.)

Smith and Forehand have moved for summary judgment on this claim, said Motion is due to be denied for failure of Defendants to "inform[ ] the district court of the basis for its [M]otion." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## V. ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby GRANTED in part and DENIED in part as follows:

(1) Defendants' Motion For Summary Judgment on Sims' Fourth Amendment unlawful detention claim against Smith and Forehand be and the same is hereby GRANTED;

(2) Defendants' Motion For Summary Judgment on Sims' Fourth Amendment unreasonable search claim against Smith and Forehand be and the same is hereby DENIED; and

(3) Defendants' Motion For Summary Judgment on Sims' Fourth Amendment excessive force claim against Smith and Forehand be and the same is hereby DENIED.