[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11512

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 12, 2012
JOHN LEY
CLERK

D.C. Docket No. 6:10-cv-00554-GKS-DAB

COLIN A. EDWARDS,

                                                       Plaintiff - Appellant,

versus

BRYAN C. SHANLEY,
City of Orlando Police Officer
JUSTIN E. LOVETT,
City of Orlando Police Officer,

                                                       Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 12, 2012)

Before TJOFLAT, MARTIN, and HILL, Circuit Judges.

MARTIN, Circuit Judge:

   This appeal considers whether clearly established federal law prohibits

police officers from allowing a police dog to conduct a five- to seven-minute attack against a person who ran from his car after a traffic stop, where he is lying face down with his hands exposed, no longer resisting arrest, and repeatedly pleading with the officers to call off the dog because he surrenders. We conclude that clearly established law does not permit this level of force. As a result, we reverse the decision by the District Court granting qualified immunity to the officers, and remand for further proceedings.

## I.

"We review de novo a district court's grant of summary judgment based on qualified immunity and apply the same legal standards as the district court." Draper v. Reynolds, 369 F.3d 1270, 1274 (11th Cir. 2004). "We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." Bashir v. Rockdale Cnty., 445 F.3d 1323, 1327 (11th Cir. 2006) (quotation marks omitted). "We recognize that facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case . . ." Oliver v. Fiorini, 586 F.3d 898, 901 (11th Cir. 2009) (quotation marks omitted). Nonetheless "we approach the facts from the plaintiff's perspective because the issues appealed here concern not which facts the parties might be able to prove,

but, rather, whether or not certain given facts showed a violation of clearly established law." Crenshaw v. Lister, 556 F.3d 1283, 1289 (11th Cir. 2009).[1]

Reading the record in this light, on the evening of December 17, 2008, Edwards drove his wife's car despite having a suspended license. While driving, he approached a stop sign and noticed a police car sitting in an adjacent lot. Edwards failed to properly stop at the stop sign, and then observed the police car driving behind him with its sirens and lights engaged. Expecting to be passed, Edwards moved his car to the right, but the police car remained behind him. Edwards then drove "a little bit down" the road and made a right turn into a library parking lot, where the police car followed.

After stopping his car, Edwards got out and ran. Officer Lovett, the driver of the police car, chased Edwards on foot. Edwards first ran toward the street, but Officer Lovett interrupted, causing Edwards to about face and run towards a nearby fence. Edwards scaled the fence, which separated the parking lot from a wooded area, but had difficulty because of the thickness of the surrounding brush. He made it "not even half a mile into the bush," and then laid down on his

---

[1] At oral argument the appellees' counsel conceded that material issues of fact pervade the record, but urged us to reject appellant's account as unlikely based upon other evidence in the record. As this is clearly the role of a jury, it would be inappropriate for us to make such determinations at this time. Our job is to determine only whether the evidence *can* be read to support a denial of qualified immunity, not to predict how the jury will weigh that same evidence.

stomach in an open area.

Officer Lovett did not immediately pursue Edwards into the woods, and instead called for backup. Officer Shanley responded to this call, and soon thereafter came to the scene with his K-9 partner, Rosco. The officers then both announced their presence and warned that they were going to use the dog if Edwards did not surrender. Hearing no response, and after a second warning, the officers entered the wooded area. The dog lead the officers to Edwards, who remained lying on his stomach with his hands exposed. Officer Shanley saw Edwards lying on his stomach and again announced the presence of the K-9 unit. Although he saw their flashlights, Edwards did not hear or respond to Officer Shanley's announcements.

As the officers got closer, Edwards heard them command him to show his hands. Because his hands were already visible, Edwards made no movement. Instead, he shouted: "[Y]ou got me. I only ran because of my license." Yet as Edwards finished making that statement, the dog, which had been released by Officer Shanley, began biting Edwards's leg. As the dog bit him, Edwards shouted "I'm not resisting" and begged the officers to call off the dog.

According to Edwards, the dog repeatedly bit his leg for somewhere

4

between five and seven minutes.[2] Edwards did not resist. The officers did not instruct him to take any further actions demonstrating compliance with their commands. Yet they neither handcuffed nor arrested Edwards, and instead stood over him while the dog maintained its bite. Eventually, one of the officers placed his knee into Edwards's back, and secured handcuffs onto both of Edwards's hands. Once handcuffed, Officer Shanley gave the dog a verbal command to release the bite.

Edwards suffered serious injuries resulting from the dog attack. Again, according to Edwards, upon seeing his leg following the attack, one of the officers described his leg as looking like filet mignon, and joked that is why the police do not feed their dogs. Edwards was then transported via ambulance to the hospital. The treating physician diagnosed him with "significant damage to [his leg's] muscles and tendons" resulting from a "very, very complex injury" that included the loss of "a large area, large chunks of full-thickness tissue along . . . [his] leg."

---

[2] Again, at summary judgment we must construe the record in the light most favorable to the non-moving party, Edwards. This standard leaves no room to dispute the length of the dog attack, because the officers say almost nothing about the attack's duration. For example, in his deposition, Officer Shanley states only that his dog "maintained hold on Colin Edwards until he was handcuffed at which point [he] instructed [the dog] to release his bite, which he did." Similarly, Officer Lovett's deposition does not address the duration of the attack. Thus, we conduct our analysis assuming the length of the attack to be five to seven minutes. But in so doing, we are mindful that the trial jury will not be similarly constrained, and will be free to reject Edwards's account as incredible if it so determines.

He received "urgent surgery" and was required to remain in the hospital for six days, and upon release underwent extensive follow-up care.

Edwards was charged with fleeing or attempting to elude a law enforcement officer, driving with a suspended license, resisting an officer without violence, and striking a police dog. Edwards pleaded no contest to the felony charge of fleeing or attempting to elude a law enforcement officer, and all remaining charges were dismissed.

In April 2010, Edwards brought this action against Officers Shanley and Lovett seeking damages under 42 U.S.C. § 1983. Specifically, Edwards alleged that Officer Shanley's use of a police dog constituted excessive force, and further that Officer Lovett failed to intervene and stop the dog attack, both in violation of the Fourth Amendment. The district court granted summary judgment for the officers based on qualified immunity. This appeal followed.

## II.

We begin with the District Court's determination that qualified immunity shields Officer Shanley from liability for his use of the dog to track and subdue Edwards. Edwards advances two theories for relief. First, he contends that Officer Shanley violated the Fourth Amendment through the mere use of a police dog. Second, Edwards argues that even if some initial use was constitutional,

6

Officer Shanley committed a distinct constitutional violation when he allowed the dog to bite Edwards for five to seven minutes while Edwards pleaded to surrender. In response, Officer Shanley argues that qualified immunity shields him from liability for either act.

We analyze Edwards's claims under qualified immunity's familiar two-step analysis. "Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008). It is undisputed that Officers Shanley and Lovett were acting within their discretionary authority while tracking and arresting Edwards.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009). In Saucier v. Katz, the Supreme Court set forth a two-step process for resolving qualified immunity claims. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). "The first step is to "determine[ ] whether the [defendant's] conduct amounted to a constitutional violation." Lewis, 561 F.3d at 1291. The second step is to determine "whether the right violated was 'clearly established' at the time of the

7

violation." Id. (quoting Saucier, 533 U.S. at 201, 121 S. Ct. at 2156). This two-step analysis is not mandatory, but is the "often appropriate" manner through which to analyze qualified immunity claims. Pearson v. Callahan, --- U.S. ---, ---, 129 S. Ct. 808, 818 (2009).

Under both theories of liability, Edwards claims that Officer Shanley violated the Constitution's prohibition on excessive police force. We analyze such claims "under the Fourth Amendment's objective reasonableness standard," Brosseau v. Haugen, 543 U.S. 194, 197, 125 S. Ct. 596, 598 (2004), asking "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." Crenshaw, 556 F.3d at 1290 (quotation marks omitted). Under this framework, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989); see also Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009).

As a result, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884 (1979). Instead, "its proper application requires careful attention to the facts and circumstances of each particular case,"

8

<u>Graham</u>, 490 U.S. at 396, 109 S. Ct. at 1872, which we achieve by examining the so-called "<u>Graham</u> factors," i.e.: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1288 (11th Cir. 2011) (quotation marks omitted).

Applying these factors to the facts as construed at summary judgment, we hold that Officer Shanley's decision to use a dog to help track and initially subdue the fleeing Edwards was constitutional, but further conclude that Officer Shanley used unconstitutionally excessive force when he permitted his dog to attack Edwards for five to seven minutes.[3] In so holding, we observe that "from the perspective of a reasonable officer," when Officer Shanley arrived, an unidentified individual had fled arrest after committing a non-serious traffic offense. Without more information, at this juncture a reasonable officer would not know the extent of the danger posed by that fleeing individual. Moreover, that the individual had fled at night into nearby woods created further reason to be apprehensive.

---

[3] Here again, we explicitly recognize that a jury is free to make its own fact determination about the length of the dog attack. At this stage of the proceeding we accept the story as told by Mr. Edwards, but in so doing we are mindful that a jury will have the opportunity to test the evidence presented by both sides in our time-honored adversarial tradition.

9

The Constitution tolerates some uses of a dog under these conditions. The Graham factors recognize that certain circumstances increase the reasonableness of certain uses of force. Here, the force necessarily caused by using a dog to track a fleeing suspect is reasonably tailored to the risk that a fleeing suspect presents. Furthermore, because the evidence shows that Edwards had not yet tried to surrender when Officer Shanley allowed his dog to first bite Edwards's leg, this is the sort of "split-second" determination made by an officer on the scene that Graham counsels against second guessing. See Graham, 490 U.S. at 396–97, 109 S. Ct. at 1872. In accord with that guidance, we defer to Officer Shanley's judgment that it was appropriate to employ extraordinary but non-deadly force in this instance.

That Officer Shanley reasonably decided to use the dog in the first instance does not mean, however, that the use of the dog was reasonable for the duration of the attack. Rather, the Graham factors compel the conclusion that Officer Shanley used unreasonable force when he subjected Edwards to five to seven minutes of dog attack, while Edwards was pleading to surrender and Officer Shanley was in a position to immediately effect Edwards's arrest. Critical to this determination is the fact that, in subjecting Edwards to the dog attack, Officer Shanley *increased* the force applied at the same time the threat presented by Edwards *decreased*. To

10

be sure, the seriousness of Edwards's fleeing Officer Lovett had not changed, and thus under the first Graham factor we accept that Officer Shanley had some reason to approach Edwards with concerns for his own safety. But insofar as fleeing from the police raises doubt about the danger an individual poses, Edwards mitigated that doubt by laying prone with his hands exposed and begging to surrender. As a result, the second and third Graham factors weigh in favor of Edwards's argument that extraordinary force was not necessary or appropriate for the entire duration of the dog attack.

Indeed, evaluating Officer Shanley's conduct at the time of the prolonged attack makes its unreasonableness plain. Because Edwards was begging to surrender, and because Officer Shanley could safely give effect to that surrender, the further infliction of pain was gratuitous and sadistic. This the Constitution does not tolerate. See Hadley, 526 F.3d at 1330 ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force.").[4] Because we must accept these allegations to be true in this procedural posture, Edwards has identified a constitutional violation attributable to Officer Shanley.

---

[4] Importantly, given the length of time that the attack is alleged to have continued, this is a materially distinct violation from the "split second" decision to use a dog to subdue and immediately arrest a fleeing suspect. See Graham, 490 U.S. at 397, 109 S. Ct. at 1872.

11

Having reached this conclusion, we must next determine whether it was clearly established at the time of Officer Shanley's encounter with Edwards that ordering a five- to seven-minute dog attack against a compliant suspect who is pleading to surrender violates the Fourth Amendment. As we recently explained, "[o]ur Circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional." Fils, 647 F.3d at 1291 (11th Cir. 2011). Specifically:

> The first method looks at the relevant case law at the time of the violation; the right is clearly established if a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law. This method does not require that the case law be materially similar to the officer's conduct; officials can still be on notice that their conduct violates established law even in novel factual circumstances. But, where the law is stated in broad propositions, a very high degree of prior factual particularity may be necessary.
>
> The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law. This method—termed obvious clarity—is a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation[.] Concrete facts are generally necessary to provide an officer with notice of the hazy border between excessive and acceptable force. But, where the officer's conduct is so outrageous that it clearly goes so far beyond these borders, qualified immunity will not protect him even in the absence of case law.

Id. at (quotation marks and citations omitted).

12

The parties call our attention to two published cases applying Graham to instances of police use of dogs, and we agree these cases bear heavily on our analysis in this case. First, in Crenshaw, we held that it was objectively reasonable for an officer to briefly use the force exerted by a police dog to subdue and detain an armed suspect until he could be handcuffed. 556 F.3d at 1291–93. The suspect in that case, Crenshaw, was thought to have committed at least one, and possibly two, armed robberies, on the same night that he was spotted by police. Id. at 1291. Upon being pursued by the police, at night, Crenshaw actively fled—first in his vehicle and then, after crashing his vehicle into a marked patrol car, by foot. Id. He entered a densely wooded area, laid on the ground, and shouted out his location in an attempt to surrender. Id. After doing so, the dog located Crenshaw and bit him thirty one times. Id. Within three to five seconds after releasing the dog, the officers surrounded Crenshaw and ordered him to give up his hands. Id. at 1286. Because Crenshaw "did not immediately give up his hands," the officer grabbed Crenshaw's right hand. Id. at 1286–87. The officer then handcuffed Crenshaw's left arm and called off the dog. Id.

We explained that all three Graham factors weighed against Crenshaw. First, "Crenshaw was suspected of having committed one, and perhaps two, armed robberies, which can be characterized as a serious crime." Id. at 1292. Second,

13

"[h]e actively fled from the police—first in his vehicle, and then by foot, after crashing his vehicle into a marked patrol car—and attempted to hide in a densely wooded area." Id. Third, "because Crenshaw was suspected of armed robbery and was a fugitive from the police, [the police] had every reason to believe that Crenshaw was armed and dangerous." Id.; see also Graham, 490 U.S. at 397, 109 S. Ct. at 1872. Thus, although the plaintiff attempted to surrender, we determined that "it was objectively reasonable for [the officer] to question [Crenshaw's] sincerity . . . and use the canine to apprehend him" in light of his past conduct. Crenshaw, 556 F.3d at 1293.

Crenshaw is thus somewhat on point to the first of Edwards's claims—that he is entitled to damages stemming from Officer Shanley's decision to use a police dog in the first instance. Indeed, given the factual similarities, Crenshaw at least precludes any conclusion that clearly established law prohibits the police from using a dog to track and subdue a fleeing suspect. But this is the extent of Crenshaw's applicability to Edwards's case.

On the other hand, we agree with Edwards that our decision in Priester v. City of Rivieara Beach, 208 F.3d 919 (11th Cir. 2000), is on all fours with the constitutional violation alleged in this case. In Priester, we held that it was objectively unreasonable for police officers to allow a dog to bite and hold a

14

suspect for two minutes, which we described as "an eternity," where that suspect was compliant with the officers' orders and not resisting arrest. Id. at 923–24, 27. Specifically, we applied the Graham factors and concluded that each weighed in Priester's favor because, he (1) was suspected of a non-serious offense—stealing $20 worth of snacks from a pro shop; (2) was compliant with the officers and lay down on the ground when ordered to, and thus "did not pose a threat of bodily harm to the officers"; and (3) "was not attempting to flee or to resist arrest." Id. at 927. We concluded that under these facts, "[n]o reasonable police officer could believe that this force was permissible given these straightforward circumstances." Id.

The same is true here. Quite simply, after we held in Priester that it was unconstitutional to subject a compliant suspect to the "eternity" of two minutes of dog attack, see 208 F.3d at 924, it is plain that it is also unconstitutional to subject a similarly compliant suspect to a longer attack of five to seven minutes, especially where that suspect is pleading for surrender. Indeed, this case is in many regards easier than Priester, because while the same factors weigh against the need for extraordinary force—"[t]here was no confusion. Plaintiff did not pose a threat of bodily harm to the officers or to anyone else. And, he was not attempting to flee or to resist arrest." Priester, 208 F.3d at 927—Officer Shanley used greater force

15

than did the officers arresting Priester. The record thus presents "a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." Hadley, 526 F.3d at 1333 (quotation marks omitted); accord Fils, 647 F.3d at 1291. As a result, Officer Shanley cannot claim qualified immunity on the grounds that he did not know he was violating Edwards's constitutional rights.[5]

In sum, we hold that clearly established federal law prohibits the police from subjecting a compliant subject who is attempting to surrender to a lengthy dog attack. As a result, we reverse the grant of qualified immunity to Officer Shanley.

### III.

Edwards also contends that Officer Lovett violated his right to be free from excessive force by failing to intervene and stop the dog attack. We have

---

[5] This conclusion is buttressed by the obviously cruel and unreasonable nature of the alleged length of the dog attack. As in Fils, even if Officer Shanley doubted the factual similarities of the two cases, there was nothing "hazy" about whether the force he used was acceptable. Fils, 647 F.3d at 1291 (quotations marks omitted). Indeed, a simple comparison between the alleged force used and the objective threat posed by Edwards renders this an "easy" case about conduct so obviously unconstitutional that no prior case would be needed to make the holding explicit. See United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227–28 (1997) ("The easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." (quotation marks omitted)).

recognized that "an officer can be liable for failing to intervene when another officer uses excessive force." Priester, 208 F.3d at 924. There is no dispute that Officer Lovett was present for the entire attack, and taking Edwards's account as true, he made no effort to intervene and stop the ongoing constitutional violation. As such, Officer Lovett is no more entitled to qualified immunity than Officer Shanley. See Priester, 208 F.3d at 927–28.

## IV.

For the foregoing reasons, we reverse the district court's judgment granting summary judgment to Officers Shanley and Lovett, and remand for further proceedings.

**REVERSED AND REMANDED.**