[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10715
_____

D.C. Docket No. 1:15-cv-02715-TWT

RANDALL KEVIN JONES,

Plaintiff-Appellee,

versus

OFFICER S. FRANSEN, in his individual capacity,
OFFICER TOWLER, in his individual capacity,
OFFICER ROSS, in his individual capacity,
K-9 DRACO, in his individual capacity,
CHIEF A.A. AYERS, and
GWINNETT COUNTY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 19, 2017)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and URSULA UNGARO,[*] District Judge.

ROSENBAUM, Circuit Judge:

In history and literature, the name "Draco" has been associated with some notorious characters. Draco of ancient Greece is perhaps best known for the harsh legal code he composed, which inspired the word "draconian." Antonios Loizides, *Draco's Law Code*, ANCIENT HISTORY ENCYCLOPEDIA http://www.ancient.eu/Dracos_Law_Code/ (last visited May 12, 2017). Draco Lucius Malfoy, of course, is Harry Potter's perpetually maleficent rival in the *Harry Potter* literary series.[1]

And to the list of infamous Dracos, add Defendant-Appellant Draco. Draco is a police canine who was involved in the apprehension of Plaintiff Randall Kevin Jones. Unfortunately, Draco inflicted some serious damage on Jones when Draco refused to release his bite. Jones sued Draco, among others, for negligence. Georgia law by its terms, however, does not provide for negligence actions directly against dogs. We therefore hold as much today and reverse the district court's denial of Defendant-Appellants' motion to dismiss Draco.

---

[*] The Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

[1] *See* J.K. Rowling, *Harry Potter and the Sorcerer's Stone* (1997); J.K. Rowling, *Harry Potter and the Chamber of Secrets* (1998); J.K. Rowling, *Harry Potter and the Prisoner of Azkaban* (1999); J.K. Rowling, *Harry Potter and the Goblet of Fire* (2000); J.K. Rowling, *Harry Potter and the Order of the Phoenix* (2003); J.K. Rowling, *Harry Potter and the Half-Blood Prince* (2005); J.K. Rowling, *Harry Potter and the Deathly Hallows* (2007).

But while Georgia law does not allow for a negligence suit against a dog, it does permit negligence claims against a state officer who is not entitled to official immunity. Title 42, United States Code, Section 1983 likewise authorizes an action against a police officer who employs a dog in an exercise of excessive force. And Jones also sued the officers responsible for Draco's encounter with Jones. In response, Defendant-Appellant Officers invoked official and qualified immunity and moved to dismiss. The district court summarily denied Defendant-Appellant Officers' motion. Today we must reverse that denial and dismiss the claims. Jones has failed to allege facts establishing that the officer acted with malice, so the officers are entitled to official immunity. Nor does binding precedent allow for the conclusion that Defendant Officers' employment of Draco in the circumstances of this case violated Jones's clearly established rights, so the officers have qualified immunity.

## I.[2]

The trouble in this case began when Jones and his girlfriend broke up. Following the split, on July 6, 2013, Jones's ex-girlfriend called 911 to report that Jones had broken into her apartment and was carrying a television to his car, which was parked at her apartment complex.

---

[2] We take the facts asserted here from the complaint and construe them in the light most favorable to the plaintiff. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347 (11th Cir. 2016).

3

Two of the officers who responded to the call included Defendant-Appellants Gwinnett County Police Department Officers Brandon Towler and Richard Ross. Towler and Ross searched the apartment-complex area for Jones. Meanwhile, another officer claimed to have seen Jones carrying a bag and a television near the apartment pool.

At some point, Defendant Officers believed that Jones had fled to a "steep ravine pond area with high concert walls, boulders and vegetation." Defendant-Appellant Officer Scott Fransen, who worked with police-canine Draco, arrived on the scene to look for Jones and issued what are known as K-9 warnings. After hearing no response, Fransen and Draco entered the ravine to find Jones. Ross and another officer provided backup.

During the search for Jones, Fransen saw Jones motionless, at the bottom of the ravine. But Fransen had already released Draco, and Draco "r[a]n loose and savagely attack[ed] and t[ore]" Jones's left arm, even though Jones lay motionless during the attack. Ross, who was also present, did nothing to protect Jones from the attack.

After "a while" passed, which Jones described as "seem[ing] like a lifetime," Fransen tried to pull Draco from Jones's arm, but Draco refused to yield. Finally, however, Fransen was able to separate Draco from Jones. But unfortunately, the

4

damage was done. This incident permanently disfigured and limited the use of Jones's arm.

## II.

Jones filed suit against Fransen, Ross, Towler, Draco, Gwinett County, and Gwinnett County Police Chief A.A. Ayers.[3] In Count I, Jones alleged a claim against Fransen under 42 U.S.C. § 1983 for the use of excessive force, in violation of the Fourth Amendment to the United States Constitution. Count II asserted a claim under § 1983 for excessive use of force, against the other officers, based on their failure to intervene and stop the canine attack. In Count III, Jones brought a claim for negligence against all Defendants. And finally, in Count IV, Jones set forth a § 1983 claim against Gwinnett County, charging that through its allegedly inadequate police training, it had violated his Fourth Amendment right to be free from the use of excessive force.

Defendants moved to dismiss the case for failure to state a claim, invoking qualified immunity with respect to Counts I and II. With regard to the state-law negligence claim, Defendants contended, among other arguments, that the County and Defendant Police Chief Ayers in his official capacity were entitled to sovereign immunity, and Defendant Officers and Ayers in their individual capacities were entitled to official immunity. The district court denied the motion.

---

[3] Other officers were also sued, but they were not served.

5

After setting forth the applicable law on the standard on a motion to dismiss, the court wrote, "The Plaintiff has stated a plausible claim with respect to his allegation that the canine officer subjected him to excessive force.    The Defendants' Motion to Dismiss . . . is DENIED.  The issues of municipal liability and qualified immunity may be revisited at the summary judgment stage."

Defendants now appeal.  Despite notice, however, Jones has not filed a brief or otherwise appeared in the appeal proceedings.

### III.

Title 28, United States Code, Section 1291 limits our appellate jurisdiction to final decisions of the district courts.  28 U.S.C. § 1291.  But we use a "practical rather than a technical construction" to construe § 1291's limitations.  *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1355 (11th Cir. 2014) (citation and internal quotation marks omitted).  As a result, under what is known as the collateral-order doctrine, § 1291 extends appellate jurisdiction over "not only judgments that terminate an action, but also a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'"  *Id.* (citation and internal quotation marks omitted).  District-court decisions falling into this category must meet three requirements:  they must "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the

6

merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Id.* (citation and internal quotation marks omitted).

Here, Defendants appeal the district court's denial of their motion to dismiss. Generally, such an order does not qualify as a "final decision." *Parker v. Am. Traffic Sols.*, 835 F.3d 1363, 1367 (11th Cir. 2016). But the Supreme Court has long recognized that denial of a motion to dismiss on qualified-immunity grounds "easily meets" the demands of the collateral-order doctrine because, among other reasons, qualified immunity is an immunity not only from liability but also from suit. *See Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985).

For the same reason, defendants may immediately appeal an order denying state official or sovereign immunity, provided that the applicable state law defines the immunity at issue as one from suit instead of from just liability. *Parker,* 835 F.3d at 1367-68. Georgia law does. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir. 1992) (per curiam) ("sovereign immunity under Georgia law is an immunity from suit"); *Shekhawat v. Jones*, 746 S.E.2d 89, 91 (Ga. 2013) ("official immunity protects state employees from *being sued* in their personal capacities") (emphasis added and omitted); Ga. Code Ann. § 15-21-25(a) ("A state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to *lawsuit* or liability therefor.") (emphasis added).

So we have jurisdiction to review the district court's denial of qualified immunity, sovereign immunity, and official immunity.  But that leaves the question of whether we may review the district court's decision to deny the County's motion to dismiss as it pertains to Jones's § 1983 municipal-liability claim.  Decisions denying dismissal of such claims generally are not immediately appealable in their own right, as they do not constitute "final decisions" within the meaning of the collateral-order doctrine.  *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 43 (1995).

We therefore consider whether we may review the claim under the pendent-appellate-jurisdiction doctrine.  That doctrine allows us to "address [otherwise] nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision [is] necessary to ensure meaningful review of the latter."  *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000) (citation and internal quotation marks omitted) (alteration adopted).  We have explained that "[m]atters may be sufficiently intertwined when they implicate[] the same facts and the same law."  *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016) (citation and internal quotation marks omitted) (alteration adopted).

Here, Gwinnett County makes no argument that the issue raised in the municipal-liability claim under § 1983 is inextricably intertwined with the claims of qualified, sovereign, or official immunity.  Nor does it seem to us that the issue

8

is inextricably intertwined. While the claims presented stem from a single incident, the municipal-liability claim raises the wholly separate issue of whether Gwinnett County had a policy, custom, or practice of deliberate indifference and inadequate training of its officers regarding the use of police dogs. This is not an issue that must be determined—or even considered—in resolving the immunity claims. Under these circumstances, we do not find the requirements of the pendent-appellate-jurisdiction doctrine to be satisfied. *See Swint*, 514 U.S. at 51. For this reason, we do not entertain Gwinnett County's appeal as it relates to Count IV, the § 1983 municipal-liability claim.

Our review of the district court's denial of the various types of immunity invoked in this case is *de novo*. *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016) (qualified immunity); *Johnson v. Conner*, 720 F.3d 1311, 1313 (11th Cir. 2013) (sovereign immunity); *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) (official immunity). In conducting our review, we accept as true all well-pled factual allegations, and we view the facts in the light most favorable to the plaintiff. *Id.* (citation and quotation marks omitted).

## V.

### A.  The § 1983 Claims

We begin our discussion by considering Jones's § 1983 claims against Defendant Officers in their individual capacities. Defendants assert that the district

9

court erred when it denied them qualified immunity under the facts of the complaint as pled in this case. We agree.

The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. *Maddox v.*

10

*Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to Jones to demonstrate that qualified immunity is inappropriate. *See id.* To do that, Jones must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated Jones's constitutional right and that that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223. We may decide these issues in either order, but, to survive a qualified-immunity defense, Jones must satisfy both showings. *Maddox*, 727 F.3d at 1120-21 (citation omitted).

Here, we address the "clearly established" inquiry first. Because we conclude that Jones's right was not clearly established in the specific context of the

11

facts in this case, we do not reach the question of whether Defendants violated Jones's constitutional rights.

When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that Defendant Officers engaged in the challenged acts, we look for "fair warning" to officers that the conduct at issue violated a constitutional right. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citations and quotation marks omitted). "Fair warning" comes in the form of binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state (Georgia, here) that "make[s] it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (citation omitted).

A plaintiff may demonstrate in any one of three ways that a defendant had "fair warning" that the right he violated was clearly established. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation and internal quotation marks omitted). First, a plaintiff may point to binding precedent that is materially similar. *Id.* This method requires us to consider "whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case." *Id.* (citation and internal quotation marks omitted).

12

Second, a plaintiff may invoke a "broader, clearly established principle" that he asserts "should control the novel facts [of the] situation." *Id.* at 1204-05 (citation and internal quotation marks omitted). Because "fair warning" is the driving force behind a determination that a right has been clearly established, when a plaintiff proceeds in this way, he must show that caselaw demonstrated the principle with "obvious clarity . . . so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* at 1205 (citation and internal quotation marks omitted). The violation of a right may also fall into this category when "[t]he reasoning, though not the holding of prior cases . . . send[s] the same message to reasonable officers in novel factual situations." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citation and internal quotation marks omitted).

Finally, a right is "clearly established" when the defendant's conduct "lies so obviously at the very core of what the [Fourth Amendment] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Loftus*, 690 F.3d at 1205 (citation and internal quotation marks omitted). Similarly, we recognize the obvious-clarity exception where conduct is "so bad that case law is not needed to establish that the conduct cannot

13

be lawful." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002). We have described this category as "narrow." *Priester*, 208 F.3d at 926-27.

Here, while we have relevant excessive-force precedent in this Circuit, no binding case involves a factual scenario that is similar enough to the one here so as to have put the officers on notice that what they did violated a clearly established right.

In his complaint, Jones asserts that Defendant Officers violated his Fourth Amendment right to be free from the use of excessive force. We evaluate excessive-force claims under the Fourth Amendment's "objective reasonableness" standard. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (per curiam) (citation omitted). This standard directs us to ask "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)) (internal quotation marks omitted). When we engage in our analysis, we must do so "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted), and we keep in mind that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citation omitted).

14

The standard requires us to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Crenshaw*, 556 F.3d at 1290 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). Factors we account for include (1) the severity of the crime; (2) whether the individual "poses an immediate threat to the safety of the officers or others"; (3) whether the individual actively resists or tries to evade arrest by flight, *id.* (quoting *Graham*, 490 U.S. at 396); (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; (6) the severity of the injury; and (7) whether officers applied force "in good faith or [rather did so] maliciously and sadistically," *id.* (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)).

And where, as in this case, police-canine bites are the form that the alleged use of excessive force takes, we have some further guidance in our binding precedent: *Priester*, 208 F.3d 919, and *Crenshaw*, 556 F.3d 1283. *Priester* and *Crenshaw* fall near opposite ends of our dog-bite excessive-force spectrum. They show how we have applied the *Graham* and *Hadley* factors to determine whether a Fourth Amendment violation occurred in the context of police-dog-bite cases.

In *Priester*, the crime at issue was one of the more minor ones; Priester was suspected of having stolen roughly $20's worth of snacks from a golf shop.

15

*Priester*, 208 F.3d at 927.  Nor did anything suggest that Priester was armed or that he otherwise posed an immediate threat to the officers or anyone else.  *Id.*  And though Priester originally fled the officers, once they discovered him, he immediately submitted to them.  *Id.*  Yet the officer who controlled the police dog nonetheless ordered his dog to attack and bite Priester for at least two minutes and threatened to kill Priester when Priester tried to resist the attack.  *Id.*  As a result of the attack, Priester suffered fourteen puncture wounds to his legs.  *Id.* at 924.  We easily concluded that the officer and his officer colleague who failed to intervene violated Priester's Fourth Amendment right to be free from the use of excessive force.[4]  *Id.* at 927-28.

In *Crenshaw*, on the other hand, we found that the canine-controlling officer and his colleague who did not intervene did not violate Crenshaw's Fourth Amendment right to be free from the use of excessive force, when the officer unleashed his police dog on Crenshaw.  *Crenshaw*, 556 F.3d at 1293-94.  Considering the various evaluative factors, we noted that the crime at issue was far

---

[4] Similarly, in *Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012), another case involving a dog bite, we concluded that *Priester* gave the officer fair warning that his actions violated the plaintiff's Fourth Amendment right to be free from the use of excessive force. In that case, the subject was pulled over on suspicion of having a suspended driver's license.  He fled his car, and officers used a police canine to find him.  When the suspect saw the officers approaching, he surrendered.  The police dog began biting him, and the suspect pled, "I'm not resisting" and begged the officers to call off the dog.  Instead, the officers stood over the suspect and the police dog as the dog continued to bite the suspect for five to seven minutes.  Finally, the officers cuffed the suspect and called off the dog.  We explained that all "the same factors [from *Priester*] weigh[ed] against the need for extraordinary force" in *Edwards,* yet the officer in *Edwards* employed "greater force than did the officers arresting Priester."  *Id.* at 1298.

16

more serious than that involved in *Priester*; Crenshaw was believed to have committed at least one, and possibly two, armed robberies. *Id.* at 1292. Crenshaw also violently fled police, crashing his car into a marked police vehicle before running into very dense woods and hiding in brush. *Id.* As a result, officers reasonably thought Crenshaw posed an immediate threat to at least themselves. *See id.* And because it was dark and officers had lost track of Crenshaw before Crenshaw yelled out, "I am over here," we found it reasonable for the officers to be concerned about a possible ambush and to continue to consider themselves at immediate risk from Crenshaw when they released the dog. *See id.* at 1291-93. The attack resulted in multiple puncture wounds to Crenshaw's legs, including one that required six stitches to close. *Id.* at 1287.

The facts in Jones's case land somewhere between those involved in *Priester* and those in *Crenshaw*. The alleged crime arguably was more serious than Priester's yet less so than Crenshaw's. Jones purportedly stole a television from his former girlfriend's residence. And while domestic-related crimes certainly have the potential to be extremely serious and dangerous, nothing about this particular incident indicated that it fell into that category. At the time Jones's ex-girlfriend reported the theft, Jones was already out of the apartment, and his ex-girlfriend gave no indication that he had been violent or armed.

17

On the other hand, when Jones fled police, unlike Priester, he did not ultimately overtly surrender himself.  Instead, he led police into physically challenging terrain with brush and boulders, similar to the place where Crenshaw fled, and he did not respond in any way to Fransen's K-9 warnings.[5]  Like the *Crenshaw* officers, a reasonable officer in one of Defendants' places could have been concerned, at the time Draco was released, about entering the heavy brush to apprehend Jones and being met by a potential ambush.

So Jones's case is not directly on all fours with either *Priester* or *Crenshaw*. As a result, neither case alone could have provided Defendant Officers with the type of "fair notice" necessary to breach qualified immunity.  And considering the cases together helps no more since *Priester* and *Crenshaw* reached opposite conclusions concerning whether an excessive-force violation occurred.

We therefore turn to the second method for proving that the right in this case was clearly established at the time of the violation.  As we have noted, Jones filed no appellate brief.  In the district court, though, Jones appears to have attempted to rely on this second way to demonstrate a clearly established right.  He invoked the

---

[5] Though the complaint asserts that Draco bit Jones for "a while," which Jones described as "seem[ing] like a lifetime," nothing in the complaint suggests that the officers gratuitously prolonged the attack under the circumstances.  Rather, the complaint notes the steep ravine walls, boulders, and vegetation that the officers had to navigate to reach Jones after Draco had caught up with him.  In the absence of any indication that the officers had the ability to shorten the length of the bite period, we cannot conclude that the officers employed Draco sadistically or gratuitously prolonged the attack.

18

general principle that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." (citations and internal quotation marks omitted).

But the Supreme Court has repeatedly instructed us that "'clearly established law' should not be defined 'at a high level of generality" and must instead be "'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted). The fact that the Fourth Amendment protects against the use of excessive force during an arrest does not provide an officer with any guidance as to what constitutes an excessive use of force. So this general principle is not the type of "broader, clearly established principle [that] should control the novel facts [of the] situation" here. *Loftus*, 690 F.3d at 1204-05 (citation and internal quotation marks omitted).

Finally, Jones did not argue—and particularly in light of *Priester* and *Crenshaw*, we cannot find—that Defendants' actions in this case "lie[] so obviously at the very core of what the [Fourth Amendment] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Loftus*, 690 F.3d at 1205 (citation and internal quotation marks omitted).

19

For these reasons, we must conclude that Jones's constitutional right was not clearly established when Defendant Officers engaged in the challenged behavior. As a result, Defendant Officers are entitled to qualified immunity, and the district court's ruling to the contrary must be reversed.

## B.  The Negligence Claim

### 1.  Sovereign Immunity

As we have mentioned, Jones brought a negligence claim against Gwinnett County and Sheriff Ayers in his official capacity, and Defendants sought dismissal of this claim on the basis of sovereign immunity.  The County and Sheriff Ayers appeal the district court's denial of their motion to dismiss on the basis of sovereign immunity.

The Georgia constitution endows "the state and all of its departments and agencies" with sovereign immunity.  Ga. Const. art. I § 2, ¶ IX; *Gilbert v. Richardson*, 452 S.E.2d 476, 478 (Ga. 1994).  Georgia's sovereign-immunity reservation also extends to counties.  *Gilbert*, 452 S.E.2d at 479; *see also* O.C.G.A. § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute.").

Nevertheless, under Georgia law, a statute may expressly waive sovereign immunity and set forth the parameters of any such waiver.  *Grech v. Clayton Cty.*, 335 F.3d 1326, 1341 (11th Cir. 2003) (citing Ga. Const. art. I, § 2, ¶ 9(e)).  But the

party seeking to impose liability bears the burden of proof in establishing waiver. *Effingham Cty. v. Rhodes*, 705 S.E.2d 856, 858-59 (Ga. App. 2010).

In the district court, Jones did not assert a waiver in response to the County's and Sheriff Ayers's invocation of sovereign immunity. And we have already noted that he failed to file an appellate brief. Under these circumstances, Jones has not met his burden to establish a waiver of sovereign immunity with respect to the County and to Sheriff Ayers in his official capacity. For this reason, the district court's denial of the motion to dismiss the claims against the County and Ayers in his official capacity must be reversed.

### 2. *Official Immunity*

Chief Ayers, Defendant Officers and Draco also assert that the negligence claim filed against them in their individual capacities should have been dismissed. We agree.

### a.    The Claims Against Defendants Fransen, Towler, Ross, and Ayers

The Georgia constitution bestows official immunity on county government officers acting in a discretionary function and sued in their individual capacity unless they "act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. art. I, § 2, ¶ 9(d); *Phillips v. Hanse*, 637 S.E.2d 11, 12 (Ga. 2006); *see also* O.C.G.A. § 36-33-4 ("Members of the council and other officers of a municipal corporation shall be personally liable

21

to one who sustains special damages as the result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law."). "Actual malice" requires a "deliberate intention to do wrong." *West v. Davis*, 767 F.3d 1063, 1073 (11th Cir. 2014) (quoting *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999) (citations omitted)).

Here, Jones's complaint sets forth no facts suggesting that the officers acted maliciously or with an actual intent to cause harm. Indeed, beyond naming Chief Ayers in his individual capacity as a defendant, the complaint makes no allegations whatsoever against him in that capacity. As for the other Defendant Officers, the law did not put them on notice of the wrongfulness of releasing Draco, and no other facts alleged suggest that any of the officers harbored actual ill intentions against Jones. Nor is the officers' intent to release Draco and apprehend Jones, in and of itself, sufficient under the circumstances of this case to establish a "deliberate intention to do wrong." As a result, the officers are entitled to official immunity for the negligence claims against them in their individual capacities, and Count III should have been dismissed. The district court's ruling to the contrary must be reversed.

### b.    The Claim Against Draco[6]

---

[6] We have jurisdiction to review this issue under the pendent-appellate-jurisdiction doctrine because the question of whether a dog may be sued at all for negligence is inextricably intertwined with the question of whether, if so, a dog may be entitled to official immunity. If we

22

Jones did not limit himself to charging negligence against only Defendants Fransen, Towler, Ross, and Ayers. Instead, Jones also alleged in his complaint that "Officer K-9 Draco of the Gwinnett County Police Department" was liable for negligence in his individual capacity. We are not persuaded.

Georgia has codified the tort of negligence. And under the express terms of Georgia law, only a person may be held liable for breaching a legal duty:

> When the law requires *a person* to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damages thereby."

O.C.G.A. § 51-1-6 (emphasis added); *see also* O.C.G.A. § 51-2-7 ("A *person* who owns or keeps a vicious or dangerous animal of any kind and who, by careless management or by allowing the animal to go at liberty, causes injury to another person . . . may be liable in damages . . . .")[7] (emphasis added).

Not surprisingly, O.C.G.A. § 50-21-22(4), which we use to determine the meaning of words used in Georgia's tort statutes, does not define the word

---

did not dispose of the claim against Draco on the ground that Georgia law does not authorize a negligence action against a dog, we would have to determine whether Draco could claim official immunity and, if so, how. In this section, we explain the problems with that scenario.

[7] O.C.G.A. § 4-8-21(b) provides that "[n]o dog shall be classified as a dangerous dog or vicious dog [for purposes of O.C.G.A. § 51-2-7] for actions that occur while the dog is being used by a law enforcement . . . officer to carry out the law enforcement . . . officer's official duties." *See also Eshleman v. Key*, 774 S.E.2d 96, 99 (Ga. 2015) (assuming for purposes of argument that a police canine may qualify as a "vicious or dangerous animal" under O.C.G.A. § 51-2-7, while acknowledging that § 4-8-21(b) precludes that conclusion).

23

"person" to include dogs.  *See id.*  Rather, it limits the definition of "person" to "a natural person, corporation, firm, partnership, association, or other such entity." O.C.G.A. § 50-21-22(4).  A dog does not qualify as any of these things.  *Cf. Miles v. City Council of Augusta*, 710 F.2d 1542, 1544 n.5 (11th Cir. 1983) (declining to hear a claim that a cat's right to free speech was infringed because a cat "cannot be considered a 'person'").

But even if any ambiguity existed over whether a police dog may be sued in tort for acts committed while serving as a police dog, the notion of a tort lawsuit directly against a dog in these circumstances would create an abundance of practical problems as well:  even setting aside the issues of service on a dog and a dog's retention of legal representation, and even assuming that Draco can qualify as a "[s]tate officer or employee" under Georgia law,[8] how could we reasonably apply Georgia's concept of official immunity?  How would we determine whether the dog was acting in a discretionary or ministerial capacity when it bit the plaintiff?  If it were acting in a discretionary capacity, how would we discern whether it had a "deliberate intention to do wrong"?  And if it were acting in a ministerial capacity and were somehow liable, could the individually liable dog be

---

[8] Though O.C.G.A. § 50-21-22(7) defines "[s]tate officer or employee" to include "law enforcement officers," the remainder of the definition suggests that the term "law enforcement officers" refers to "persons," since the word "person" or "persons" is used three other times in the definition, and the definition does not appear to contemplate the inclusion of animals.

24

expected as a practical matter to pay damages?  And if so, how?[9]  These kinds of

issues, all of which flirt with holding a dog civilly liable in its own right—not as

the instrument or responsibility of another—are simply not suited for resolution in

_____

[9] Similarly, the Seventh Circuit rejected the notion that a dog could be sued under 42 U.S.C. § 1983.  In reaching this conclusion, the Seventh Circuit identified numerous dilemmas that would arise if the rule were otherwise:

> Was [the dog] served with process?  Did he retain as his lawyer [the same attorney] who purports to represent all . . . defendants?  Was [the dog] offered the right of self-representation under 28 U.S.C. § 1654?  What relief does [the plaintiff] seek from a dog—[the dog's] awards, perhaps?  Could [the dog] claim qualified immunity?  If a reasonable person in the defendant's position would not have understood that what he was doing violated the Constitution, damages are unavailable.  Must we then ask whether a reasonable dog in [the defendant dog's] position should have understood that he was violating [the plaintiff's] constitutional rights?

*Dye v. Wargo*, 253 F.3d 296, 299 (7th Cir. 2001) (citation omitted).

Draco suggests that Jones also seeks to recover against him under § 1983.  We do not read the complaint the same way.  But to the extent that the complaint could be understood to sue Draco under § 1983, that cause of action would also necessarily fail.  In addition to the problems that the Seventh Circuit identified, the terms of § 1983 do not appear to contemplate such an action, either.  Section 1983 creates a cause of action against "[e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  42 U.S.C. § 1983 (emphasis added).  The Dictionary Act, 1 U.S.C. § 1, which we use to "determin[e] the meaning of any Act of Congress, unless the context indicates otherwise," does not expressly include dogs in its definition of "person."  *See id.*  Instead, it defines the term "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  *Id.*  A dog does not obviously fall into any of these categories.  And while the word "individual" can be ambiguous, the dictionary's primary definitions for it refer solely to a human being:  "1a. A single *human* considered apart from a society or community . . . . b. A *human* regarded as a distinctive or unique personality."  *Individual*, The American Heritage Dictionary of the English Language (5th ed. 2011) (emphasis added).  *But see id.* at definition 2 ("A single organism as distinguished from a species, community, or group.").  Nor does anything in the context of § 1983 suggest that Congress intended to authorize lawsuits directly against dogs.  And, as we have noted above, outside the context of § 1983, we have also previously found that an animal does not qualify as a "person."  *Miles*, 710 F.2d at 1544 n.5.

our adversarial process.  For all of these reasons, we must conclude that Draco in his individual capacity may not be sued for negligence under Georgia law, and the district court's denial of the motion to dismiss Draco must be reversed.

## VI.

In summary, we conclude that Defendant Officers Fransen, Towler, and Ross are entitled to qualified immunity because binding precedent does not clearly establish that their actions in allowing Draco to apprehend Jones violated Jones's Fourth Amendment rights.  So we **REVERSE** the order of the district court and **REMAND** with instructions to dismiss Counts I and II of Jones's complaint.  We also hold that a dog may not be sued individually for negligence since a dog is not a "person."  And because we conclude that the County and Chief Ayers in his official capacity have sovereign immunity, and Defendants Fransen, Towler, Ross, and Ayers are entitled to official immunity for the claims against them in their individual capacities, we **REVERSE** and **REMAND** with instructions that the district court dismiss Count III.  We decline to address the propriety of the district court's denial of dismissal on Count IV in the interlocutory posture of the case.

**REVERSED and REMANDED.**

26